Filed 3/6/13  In re T.G. CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re T.G., a Person Coming Under the Juvenile Court Law. | |
| ALAMEDA COUNTY SOCIAL SERVICES AGENCY,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>T.B.,<br><br>　　　Defendant and Appellant. | A134874<br><br>(Alameda County<br>Super. Ct. No. HJ09011633) |

T.G. tested positive for cocaine at birth and was removed from the custody of his mother, Deanna G. (mother).  Appellant T.B. (father) was not married to mother and did not reside with her, but was subsequently determined to be  T.G.'s biological father.  He appeared at the jurisdiction hearing, requested paternity testing, and stated that he would seek custody if T.G. was his son.  Although ultimately recognizing T.B. as T.G.'s "presumed father," the juvenile court terminated the parental rights of both mother and father.  (Welf. & Inst. Code, § 366.26.)[1]  Father appeals, arguing that the order terminating his parental rights was constitutionally invalid because the juvenile court never made a finding that he was an unfit parent.  We agree and reverse.

---

[1] Unless otherwise indicated, all further statutory references are to the Welfare and Institutions Code.

# I.     THE LAW REGARDING PARENTAGE

"The Uniform Parentage Act (Fam. Code, § 7600 et seq.) . . . provides the statutory framework by which California courts make paternity determinations. [Citations.]  Under this statutory scheme, California law distinguished 'alleged,' 'biological,' and 'presumed' fathers.  [Citation.]  'A man who may be the father of a child, but whose biological paternity has not been established, or, in the alternative, has not achieved presumed father status, is an "alleged" father.  [Citation.]'  [Citation.]  'A biological or natural father is one whose biological paternity has been established, but who has not achieved presumed father status . . . .'  [Citation.] [¶] 'Presumed' fathers are accorded far greater parental rights than alleged or biological fathers.  [Citation.]  Presumed father status is governed by [Family Code] section 7611, which sets out several rebuttable presumptions under which a man may qualify for this status . . . .  [Citations.]  Biological fatherhood does not, in and of itself, qualify a man for presumed father status under [Family Code] section 7611.  On the contrary, presumed father status is based on the familial relationship between the man and the child, rather than any biological connection.  [Citation.]" (*In re J.L.* (2008) 159 Cal.App.4th 1010, 1018, fn. omitted.) "[T]o become a presumed father, a man who has neither married nor attempted to marry his child's biological mother must not only openly and publicly admit paternity, but must also physically bring the child into his home." (*Adoption of Michael H.* (1995) 10 Cal.4th 1043, 1051, italics omitted.)

"California dependency law distinguishes between a presumed father, a biological father and a biological father who came forward early in the dependency case and displayed a full commitment to the child (*Kelsey S.* father).  (*Adoption of Kelsey S.* (1992) 1 Cal.4th 816; *In re Zacharia D.* (1993) 6 Cal.4th 435, 451; *In re Jason J.* (2009) 175 Cal.App.4th 922, 931–932 . . . .)" (*In re A.S.* (2009) 180 Cal.App.4th 351, 362 (*A.S.*), parallel citations omitted.)  "[T]he private interest at stake in dependency proceedings varies according to the father's status.  Presumed fathers possess far greater rights than biological fathers.  [Citation.]  '[A] biological father's "desire to establish a personal relationship with [his] child, without more, is not a fundamental liberty interest

2

protected by the due process clause." [Citation].' [Citation.]" (*A.S., supra,* 180 Cal.App.4th at p. 359, italics omitted.) "[O]nly a presumed, not a mere biological, father is a 'parent' entitled to receive reunification services under section 361.5." (*In re Zacharia D., supra*, 6 Cal.4th at p. 451.) Thus, the courts have "consistently held that a biological father's rights are limited to establishing his right to presumed father status, and the court does not err by terminating a biological father's parental rights when he has had the opportunity to show presumed father status and has not done so. [Citations.]" (*A.S.,* at p. 362.) With respect to *Kelsey S.* fathers and presumed fathers, however, the juvenile court cannot terminate parental rights without finding, by clear and convincing evidence, that placement with the father would be detrimental. (*Adoption of Kelsey S., supra,* 1 Cal.4th at p. 849; *In re G.S.R.* (2008) 159 Cal.App.4th 1202, 1205; *In re Gladys L.* (2006) 141 Cal.App.4th 845, 847–848 (*Gladys L.*).)

At the dispositional hearing, a noncustodial presumed father is entitled to request custody, pursuant to section 361.2. Section 361.2, subdivision (a), provides: "When a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child. If that parent requests custody, the court *shall* place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." (Italics added.) Our Supreme Court has said that "section 361.2 applies only when the child is first removed from the custodial parent's home." (*In re Zacharia D., supra*, 6 Cal.4th at p. 439.)

## II. FACTUAL AND PROCEDURAL BACKGROUND

*Section 300 Petition*

On January 7, 2009, the Alameda County Social Services Agency (Agency) filed a section 300 petition on behalf of T.G., who was a newborn baby at the time. The petition alleged mother's failure to protect T.G. (§ 300, subd. (b)), after T.G. tested positive for cocaine at birth. Mother admitted using cocaine and marijuana during her pregnancy.

3

The petition also alleged that mother had failed to reunify with at least one of T.G.'s siblings or half-siblings. Finally, the petition alleged, pursuant to section 300, subdivision (g): "The identity, whereabouts and circumstances of the father's ability to care for [T.G.] is unknown. [Mother] states that she does not know who the father is."

*Detention Report and Hearing*

On January 8, 2009, T.G. was ordered detained. In the detention report, the social worker reported: "This is [mother's] tenth child. She has four adult children and 5 minors who [have] been placed out of her care and adopted. [Mother] did not seek out prenatal care because she said that her other babies were born healthy. . . . [Mother] stated that she does not know the father of the child. She was prostituting herself when she got pregnant and has no idea who the father is." Despite mother's long history of substance abuse, she had never entered a drug treatment program.

*Jurisdiction/Disposition Report and Determination*

In the jurisdiction/disposition report, the social worker recommended that no reunification services be provided to mother, pursuant to section 361.5, subdivisions (b)(11) and (b)(13), because she had failed to treat her substance abuse problem. The Agency also indicated that T.G.'s father remained unknown and asked the court to set a section 366.26 hearing.

By the time of the combined jurisdiction and disposition hearing, mother had disappeared. However, father appeared and was appointed counsel. Father's counsel indicated that father had signed a statement regarding parentage (Judicial Council Forms, form JV-505) indicating that he was requesting the court to order paternity testing, although he was unable to pay for it. Father also stated that, if he was T.G.'s biological father, he would seek custody. Father pointed out that he had custody of T.G.'s then 14-year-old sister, Nicole B. The Agency stated that it opposed court-ordered testing because it was not willing to pay. When the juvenile court asked father's counsel for authority to support his request for court-ordered testing, father's counsel said: "It's been past custom in this county. I don't know if [father] has an absolute right. I think it's the

4

court's discretion to order paternity testing for alleged fathers who present themselves in court and who have signed a declaration requesting same."

The juvenile court concluded that father, as an alleged father, did not have standing to contest the jurisdictional allegations. Thus, the matter was submitted on the report prepared by the Agency. The court found "true" the allegations under both section 300, subdivision (b), and subdivision (g). The court found: "The welfare of [T.G.] requires that custody be taken from the following person(s): mother, Deanna [G.] [¶] For Federal AFDC purposes, the home of removal is that of the mother . . . ." The court also ordered bypass of reunification services as to mother, pursuant to section 361.5, subdivisions (b)(11), (b)(13), and (b)(15). The court also ordered: "Reunification services shall not be provided to the alleged father unless and until he establishes a legal basis." With respect to paternity testing, the juvenile court said: "Given all the circumstances I've heard, [if father] is truly interested in being the custodial parent and caregiver for this young child, then he should take the responsibility and find the wherewithal to pay for his paternity test absent some authority where the court must do it given the ability-to-pay situation. [¶] . . . [¶] I'm not ordering testing. If he wants to be tested, fine. What I'm saying is that whatever test has to be paid for by this gentleman." A section 366.26 hearing was set.

*Section 366.26 Report*

In advance of the section 366.26 hearing, the Agency submitted a section 366.26 report recommending that legal guardianship be approved as the permanent plan. The social worker noted that T.G.'s maternal cousin, S.T., and her partner, K.B., had been approved for placement. S.T. and K.B. were not interested in adoption but had requested appointment as legal guardians.

The social worker also wrote: "[Father] was referred to the Department of Child Support Services (DCSS) to pursue a paternity test; however, the Agency has since been informed that the DCSS is no longer doing paternity tests unless there is a specific child support claim case opened. Further, staff from DCSS referred the Agency to send clients to the Family Law Facilitator's Office Self Help Center through which the alleged parent

5

can complete and file a Paternity Packet with the Family Law Court. This would initiate a child support claim case and therefore a paternity test. On 05/01/2009, the undersigned spoke with [father] who reported that he would be willing to do this . . . ."

*Permanent Plan Hearing*

The hearing on selection of a permanent plan took place, on June 3, 2009. The matter was submitted on the social worker's report. However, father's counsel noted: "We would like you to order the Agency to do the paternity testing and go along and have the guardianship established. We want both things to occur." The Agency's counsel responded: "It has been our position if someone wants to know those results because they want to step forward and be a father, then they should be responsible for that and take it on themselves. [¶] . . . [¶] We are asking that the legal guardianship proceed today. If he really needs to have that test result for himself, he can go to the Family Support Center and take the test. If he doesn't want to take on the financial responsibility, then I don't know why he would want to know that for sure. He is still being granted visitation rights."

The juvenile court found that notice had been given as required by law, found it likely that T.G. would be adopted, but selected legal guardianship as T.G.'s permanent plan because he was living with a relative who was unable or unwilling to adopt. Reasonable visitation was ordered for both mother and father. Letters of guardianship issued. Father was directed to the Self Help Center at the Family Law Center for paternity testing.

*Status Review Report*

On October 23, 2009, the Agency filed a status review report, which indicated that S.T. and K.B. now wished to adopt. Accordingly, the Agency asked the court to schedule another section 366.26 hearing. The report also noted: "[Father] has been referred to Lab Corporation for a DNA Paternity Test. [Father] states that if he is the biological father . . . , he will oppose termination of his parental rights." It was also noted that father had been having unsupervised overnight visits with T.G. and had expressed his desire for custody, if T.G. was his biological son.

6

*Presumed Father Finding*

On November 23, 2009, the juvenile court received the positive results of the paternity testing and declared father T.G.'s "presumed father." Father announced his intent to contest termination of his parental rights.

*Request to Change Court Order*

Shortly thereafter, father filed a request to change the court's February 4, 2009 order, which had concluded father was ineligible for reunification services. The Agency opposed father's request, arguing: "[W]here, as here, reunification services have been denied or terminated, particularly when the permanent plan is adoption, the focus shifts from a parent's interest in the care, custody, and companionship of the child to the needs of the child for permanency and stability. . . . [¶] . . . [¶] Here, Presumed Father alleges that the recent establishment of his paternity constitutes changed circumstances. This alleged change of circumstances comes too late. As mentioned earlier, Presumed Father's whereabout[s] were known as of January 8, 2009 and he has appeared in this matter as [T.G.'s] alleged father since the first uncontested hearing on January 26, 2009. Therefore, as of January 26, 2009, . . . Presumed Father was represented by counsel [and] should have been made aware that a permanent plan of adoption would mean a termination of his parental rights. Even so, as previously discussed, Presumed Father did not pursue presumed father status in a timely manner. Presumed Father was given multiple referrals for paternity tests on February 4, 2009, March 25, 2009, May 1, 2009, and again prior to November 9, 2009, but did not follow through until October or November of 2009. [¶] . . . [¶] [I]t would likewise be difficult to imagine how Presumed Father could show that the best interests of [T.G.] would be served by returning him, since Father has never actually parented him prior to his removal. In fact, [the social worker], if called as a witness, is prepared to testify that Presumed Father has only initiated four (4) visits with [T.G.] since May of 2009."

At a hearing on the matter, held on February 26, 2010, the juvenile court set aside its original order and ordered the Agency to provide father with six months of reunification services. The court explained: "[T]he child is being protected by very able

legal guardians apparently.  And even when in the company of the father, there is no risk that has been mentioned or brought up in evidence either through the father's testimony, and in cross-examination, or through any of the reports, at least it hasn't been pointed out to me. [¶] The largest concern I have about the father is his representation that he has been a successful parent, and obviously that is questionable given the number of children he's had who have been through the system one way or the other, or permanently planned either adopted or dependent.  So the Court has some concern about his parenting skills, though that wasn't fully developed. [¶] Looking at the second purpose of providing services to the family to preserve the family or reunify with the family . . . this is not a matter of termination of family reunification services by the father . . . by anything that he did such as being abusive, neglectful, or not visiting with his child.  To the contrary, . . . [¶] he has done nothing to cause the break up of the family."

The Agency sought reconsideration of the court's ruling, which was granted.  The court ordered termination of father's reunification services.  The court explained:  "I still think it is a tough case.  And upon further review, . . . I thoroughly agree with [the Agency's counsel.]  I made a mistake.  I did not analyze the facts like I should have.  I put too much importance on [father's] desires to step up to be a father.  That is not what the law requires in this instance.  It's what's in the best interest of the child and whether or not there is a beneficial parent relationship that would be in the best interest of . . . the child.  There is no evidence of that."  At the conclusion of the reconsideration hearing, the Agency represented that it was no longer seeking adoption as T.G.'s permanent plan.

*Requests to Terminate the Guardianship*

A status review report, filed on July 28, 2010, indicated that the guardians now wished to set aside the legal guardianship and supported placement of T.G. with father.  Father and T.G. continued to have unsupervised weekend visits.  T.G.'s guardians reported that T.G. appeared to enjoy the visits and returned to their home well cared-for and in good spirits.  Both father and the guardians filed requests to terminate the guardianship.  K.B. stated, in her declaration in support:  "I believe it is in [T.G.'s] best

8

interest to be allowed to be raised by his father . . . . [Father] has demonstrated a commitment to [T.G.], and will provide a stable and permanent home for [T.G.]"

The Agency submitted a report in advance of the hearing, in which it recommended that the legal guardianship be set aside and T.G. be placed with father, with family maintenance services. The social worker reported that "[the guardians] wouldn't feel comfortable preventing [T.G.] from residing with his father given that [father] has show[n] his willingness and . . . his ability to parent [T.G.]." The social worker also wrote: "The father reported . . . he has resided in his current residence for approximately 10–12 years. He is currently employed as a Maintenance Worker . . . . He currently has a 2 bedroom unit in which his girlfriend, his girlfriend's 4 year old daughter and his 15 year old daughter reside. . . . [¶] . . . [¶] The Agency is concerned that the father has limited experience caring full-time for a toddler. However, the father has demonstrated a commitment to [T.G.] via consistent visitations, which include overnights. [T.G.] appears very affectionate towards his father and enjoys spending time with him."

The matter came on for hearing on August 26, 2010. At the hearing, counsel for the legal guardians indicated that they had changed their minds yet again and now wanted to go forward with adoption. Because there was no longer any changed circumstance, the court denied the requests for a change of court order. The court also said: "I must say I am a little concerned, and for some reason mildly disappointed that we are here. I was really happy to hear that [father] was in a position to maybe get [T.G.] back."

*Third Request for a Change of Order*

On September 9, 2010, father filed yet another request to change a court order, which sought termination of the guardianship and placement of T.G. in his custody. He asserted that S.T. and K.B. had not demonstrated commitment to T.G. The juvenile court concluded that father had not met his burden to show changed circumstances. The court explained: "There is no question in my mind that [father] has stepped up as a father. I have been consistent in that regard, but we must follow the law. [¶] . . . [¶] There is no

9

evidence that the legal guardians, at this time, are unwilling to have physical custody of [T.G.]."

*Section 366.26 Report*

The Agency again recommended adoption as T.G.'s permanent plan and another section 366.26 hearing was calendared. The social worker observed: "[T.G.] has a regularly scheduled monthly weekend visit with his father . . . . The visitation schedule was the result of a mediation agreement developed on 03/11/11. Visits are unsupervised and appear to go well for all parties. [T.G.] shows no signs of any emotional discomfort at transitioning between his guardian's home and his father's home." The social worker also wrote: "[T.G.] has been living in [S.T.'s and K.B.'s] home . . . for a significant period of time and fits easily into the household. . . . [T.G.] has no health or emotional issues that would present an obstacle to adoption. [¶] . . . [¶] [T.G.] seeks [the guardians] out for comfort, reassurance, and to show off his new developmental skills. He can be soothed by his proposed adoptive parents and is quick to give and receive affection and nurturing. He is affectionate and very socially engaging. [T.G.] is able to leave and return to the proposed adoptive parents, i.e. for daycare or visits with [his] father, without discomfort. The relationship is a parent-child relationship."

An updated report was provided, on January 5, 2012. Therein, it was reported that father's visitation with T.G. had been inconsistent. Specifically, the social worker wrote: "The caregivers state that [father] cancelled the October visit due to him being . . . hospitalized for medical concerns. The caregivers . . . offered [father] a visit over the Halloween weekend but this offer was not acted upon. [¶] The caregivers also report that the visit in November was cancelled when [father] called and stated he did not have the funds to pick up and drop off [T.G.] this month [in Sacramento]. The caregivers reported . . . that they were traveling to the bay area and offered to drop [T.G.] off [at father's Oakland home] and [father] would then only be responsible for getting [T.G.] back to their home in Sacramento. This offer was also reportedly not acted upon. [¶] Finally, the caregivers have expressed some frustration that they have been the ones to initiate the visit by calling [father] and arranging the details and if they don't [father] will not call

10

independently and a visit will not be scheduled. . . . Although the inconsistency of [father's] visitation has reportedly had little effect upon [T.G.] at this young age, it may become more harmful to him if the pattern continues in the future."

*Termination of Parental Rights*

The section 366.26 hearing was ultimately held on February 22, 2012. Father's counsel argued that the parental bond exception to adoption (§ 366.26, subd. (c)(1)(B)(i)) applied, and submitted the matter on the basis of the Agency reports. However, father conceded that he had not visited with T.G. since September 17, 2011. He explained: "[T]he mediation was like for me to come and pick [T.G.] up and for [S.T. and K.B.] to come and get him at my home. They told me they couldn't do it. They stopped, so I'm on the train and . . . I can't pay $150. . . . So . . . I had took ill, right, and . . . once she told me that she could come into town and everything and pick him up—that wasn't the deal. One Sunday afternoon I had to get up out of my bed and bring him back home . . . because nobody was going to come and get him, and I really didn't have the money to do this, you know, so that is the only issue that I have. . . . I love to have my child . . . every weekend . . . but I'm not going to drive way out to Sacramento and then drive back to bring him back home."

The court found that it was likely that T.G. would be adopted and that father had not met his burden of proving an exception. The court said: "We wouldn't have been this far if you were able to visit more because everyone would have realized that you had developed [a parent-child] relationship. Unfortunately, you have not. I saluted you in the past for stepping up and wanting to be the father coming to court all the time doing all the testing and at some point visiting somewhat, but you didn't follow through, and it's a question of what your priorities are, how you spend your money—you weren't eligible after a certain period of time for transportation costs from the agency—then you have to decide is this worth it to me enough where I'm going to prioritize my money to be able to go visit my son, and apparently you made the choice not to do that, and that's unfortunate." Mother's and father's parental rights were terminated. Father filed a timely notice of appeal.

11

### III. DISCUSSION

On appeal, father does not challenge the juvenile court's findings that it is likely T.G. will be adopted, within the meaning of section 366.26, subdivision (c)(1), or that the exception to adoption found in section 366.26, subdivision (c)(1)(B)(i), does not apply. Instead, he argues: "[D]ue process requires that a parental rights termination order be supported by clear and convincing evidence establishing that a parent is somehow 'unfit.' In most California dependency cases, the detriment findings made to support removal of [T.G.] at the dispositional hearing and review hearings provide the court with adequate evidence of parental unfitness. But in this case, father was not recognized as a presumed father until after those hearings had taken place, so detriment findings were not made against him. Because the court never made any finding suggesting that father was an unfit parent, the order terminating his parental rights was constitutionally invalid."

#### A. *Forfeiture*

Preliminarily, we must agree with the Agency that father has forfeited the argument he raises on appeal. Not once did father's trial counsel argue that his parental rights could not be terminated because no finding of parental unfitness had been made. In dependency litigation, "[a] party forfeits the right to claim error as grounds for reversal on appeal when he or she fails to raise the objection in the trial court. [Citations.]" (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 221–222.) However, as father correctly points out, "application of the forfeiture rule is not automatic." (*In re S.B.* (2004) 32 Cal.4th 1287, 1293, superseded by statute on other grounds as stated in *In re S.J.* (2008) 167 Cal.App.4th 953, 962; *In re Karla C.* (2010) 186 Cal.App.4th 1236, 1267.) Because father raises an important constitutional issue, we decline to pass the issue. (See *In re S.B.,* at p. 1293 ["the appellate court's discretion to excuse forfeiture should be exercised rarely and only in cases presenting an important legal issue"]; *In re Frank R.* (2011) 192 Cal.App.4th 532, 539 (*Frank R.*) ["we are reluctant to enforce the waiver rule when it conflicts with due process"]; *In re P.A.* (2007) 155 Cal.App.4th 1197, 1210 (*P.A.*) ["an appellate court *may* review an error despite a party's failure to raise it below if due process rights are involved"]; *Gladys L., supra,* 141 Cal.App.4th at p. 849 [same].)

12

Because father has raised a question of law, we review the claimed constitutional violation de novo.  (*A.S., supra,* 180 Cal.App.4th at p. 360.)

B.      *The Merits of Father's Constitutional Argument*

"[F]reedom of personal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment."  (*Santosky v. Kramer* (1982) 455 U.S. 745, 753.)  "[T]he State cannot presume that a child and his parents are adversaries.  After the State has established parental unfitness at that initial proceeding, the court may assume at the *dispositional* stage that the interests of the child and the natural parents do diverge.  [Citation.]  *But until the State proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of their natural relationship*."  (*Id.* at pp. 760, some italics added & fn. omitted.)  Thus, "[b]efore a State may sever completely and irrevocably the rights of parents in their natural child, due process requires that the State support its allegations by at least clear and convincing evidence."  (*Id.* at pp. 747–748.)

In *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 253–254 (*Cynthia D.*), our Supreme Court held that *Santosky v. Kramer* did not require that a detriment finding be made, at the termination hearing, under the clear and convincing evidence standard.  The court reasoned:  "Unlike the termination hearings evaluated in *Santosky v. Kramer, supra,* 455 U.S. 745, . . . the purpose of the section 366.26 hearing is not to accumulate further evidence of parental unfitness and danger to the child, but to begin the task of finding the child a permanent alternative family placement.  By the time dependency proceedings have reached the stage of a section 366.26 hearing, there have been multiple specific findings of parental unfitness.  Except for a temporary period, the grounds for initial removal of the child from parental custody have been established under a clear and convincing standard (see § 361, subd. (b)); in addition, there have been a series of hearings involving ongoing reunification efforts and, at each hearing, there was a statutory presumption that the child should be returned to the custody of the parent.  (§§ 366.21, subds. (e), (f), 366.22, subd. (a).)  Only if, over this entire period of time, the state continually has established that a return of custody to the parent would be

13

detrimental to the child is the section 366.26 stage even reached. [¶] . . . [¶] . . . It is not the purpose of the section 366.26 hearing to show parental inadequacy, which had to have been previously established, and there is no burden on the petitioning agency to show at the section 366.26 hearing that the parents are 'at fault.' The number of previous findings of 'fault,' coupled with the seriousness of the resulting danger to the minor, most clearly differentiate the section 366.26 hearing from the termination hearing in *Santosky v. Kramer*. A parent whose conduct has already and on numerous occasions been found to grievously endanger his or her child is no longer in the same position as a parent whose neglect or abuse has not so clearly been established. At this point the interests of the parent and child have diverged, and the child's interest must be given more weight." (*Cynthia D.,* at pp. 253–254, fns. omitted.)

In arguing that the juvenile court terminated his parental rights in violation of due process, father relies on *Santosky v. Kramer* and a trio of appellate opinions distinguishing *Cynthia D.*: *Gladys L, supra,* 141 Cal.App.4th 845, *Frank R., supra,* 192 Cal.App.4th 532, and *In re Z.K.* (2011) 201 Cal.App.4th 51 (*Z.K.*).

In *Gladys L., supra,* 141 Cal.App.4th 845, the minors became dependents of the juvenile court after being removed from their mother's custody. The nonoffending father appeared at the detention hearing, was declared the presumed father, but then disappeared for three years and did not seek custody. (*Id.* at p. 847.) He reappeared at the section 366.26 hearing and requested visitation. Father's parental rights were terminated. (*Ibid.*) The Second District Court of Appeal began by reviewing U.S. Supreme Court precedent. It observed: "California's dependency system comports with *Santosky*'s requirements because, by the time parental rights are terminated at a section 366.26 hearing, the juvenile court must have made prior findings that the parent was unfit." (*Gladys L.,* at p. 848, citing *Cynthia D., supra,* 5 Cal.4th at p. 254.) "The linchpin to the constitutionality of the section 366.26 hearing is that prior determinations ensure 'the evidence of detriment is already so clear and convincing that more cannot be required without prejudice to the interests of the adoptable child, with which the state must align itself.' [Citation.]" (*Gladys L.,* at p. 848.)

But, the *Gladys L.* court went on to conclude that the requirements of *Santosky v. Kramer* and the safeguards embedded in the California dependency scheme had been ignored. (*Gladys L., supra*, 141 Cal.App.4th at p. 848.) The court reasoned: "[The social services agency] never alleged that [the father] was unfit and the trial court never made that finding. Due process therefore prohibits the termination of [his] parental rights. Implying a finding of detriment . . . asks this court to act as petitioner and fact finder, thereby denying [the father] an opportunity for notice of specific charges and an opportunity to respond to the charges against him. [Citation.]" (*Id.* at pp. 848–849.) The *Gladys L.* court also rejected the notion that the father had forfeited his due process argument by failing to raise it before the juvenile court. (*Id.* at p. 849.) It stressed: "Although the reversal of the juvenile court's order undermines the important goal of rapidly concluding dependency proceedings, it is the only way to safeguard [the father's] rights as . . . presumed father and ensure that he is afforded due process." (*Id.* at p. 849.) Accordingly, the termination order was reversed. (*Ibid.*)

In *Frank R., supra,* 192 Cal.App.4th 532, an order terminating a nonoffending father's parental rights was reversed on similar grounds. (*Id.* at p. 534.) In that case, the father had been involved in the children's lives before the dependency and provided income for their support. Thus, when father appeared in the juvenile dependency proceedings, he immediately stated his desire to reunify and was declared a presumed father. (*Id.* at pp. 534–535.) Although the dependency petition had alleged the father's failure to provide for the children, pursuant to section 300, subdivision (g), the court found the allegations untrue and dismissed them. Accordingly, at disposition, the children were removed from the mother's custody only. (*Id.* at p. 535.) During the dependency, the father visited the children only irregularly. In fact, he had not seen them at all for three months before the section 366.26 hearing. The father claimed that transportation was difficult and repeatedly requested bus passes. Although the child welfare agency obtained bus passes, the father never came to pick them up. He also did not request placement of the children. (*Id.* at pp. 535–536.)

15

On appeal, the Second District Court of Appeal again held that the juvenile court had failed to comply with constitutional and statutory safeguards by failing to make a finding of detriment by clear and convincing evidence with respect to the father. (*Frank R., supra,* 192 Cal.App.4th at p. 538.) The court explained: "At the jurisdiction hearing, father was deemed a nonoffending parent. Hence, the juvenile court never even made the initial finding of unfitness . . . . [¶] More important, when the juvenile court was called upon to make the requisite finding of detriment by clear and convincing evidence in order to remove the children from a parent's custody [citations], it made no such finding as to father because he was noncustodial and did not request custody. Rather, the court stated at the hearing that it was proceeding as to mother only and then found in the singular that, 'clear and convincing evidence suggests . . . [that] [s]ubstantial danger exists to the physical health of minor(s) and/or minor(s) is suffering severe emotional damage, and there is no reasonable means to protect without removal from parent's or guardian's physical custody.' . . . At no time during the dependency did the court ever make the requisite detriment finding by clear and convincing evidence as to father. (§ 361, subd. (c)(1).)" (*Frank R.,* at pp. 538–539.)

The *Frank R.* court also considered whether it could infer a finding of detriment. It observed: "Father argues that the only basis for an unfitness finding was his lack of housing and inability to afford transportation to visit his children, and that 'poverty alone, even abject poverty resulting in homelessness, is not a valid basis for assertion of juvenile court jurisdiction.' (*In re G.S.R., supra,* 159 Cal.App.4th 1202, 1212.) The Department counters that father's unfitness lies in his failure to protect the twins from mother by allowing them to live with her when he knew she was abusing drugs; father's sporadic visits with the twins and lack of telephone contact during the dependency, and his failure to diligently attend to the children's educational needs, all of which supports the juvenile court's finding that father lacked motivation and commitment to the twins. However, although there may be valid bases for the juvenile court to make a finding of father's unfitness, the court never made that finding, let alone by the required clear and convincing standard. We may not make that finding here or infer such a finding."

16

(*Frank R., supra,* 192 Cal.App.4th at p. 539.) Accordingly, the court concluded that due process required reversal of the order terminating the father's parental rights. (*Id.* at pp. 539–540.)

The Agency does not discuss any of these cases, with the exception of *Gladys L.*, in its respondent's brief. Instead, it broadly argues: "A finding of parental unfitness or detriment is not required for termination of parental rights. Instead, parental rights may be terminated, and a child freed for adoption, based on the best interests of the child, without a finding of parental unfitness, and without violating a parent's substantive due process rights." The Agency's failure to limit the applicability of its suggested rule is rather startling.

If father had never elevated his status to presumed father, we would agree that his rights could be terminated solely by considering T.G.'s best interests. (See *Quilloin v. Walcott* (1978) 434 U.S. 246 (*Quilloin*) [parental rights of natural father who had never had or sought custody could be terminated without finding of unfitness]; *Guardianship of Ann S.* (2009) 45 Cal.4th 1110, 1129 ["*Quilloin* demonstrates that the best interest of the child is a constitutionally permissible basis for terminating parental rights *in some circumstances*" (italics added); *A.S., supra,* 180 Cal.App.4th at p. 362 [a biological father's parental rights can be terminated without any finding of unfitness or detriment].)[2]

---

[2] In *Quilloin, supra,* 434 U.S. 246, the United States Supreme Court confronted the case of a child born out of wedlock, who had been in his mother's custody his entire life. When the child was 11, the mother's new husband sought to adopt him. (*Id.* at p. 247.) The natural father, who was not seeking custody for himself and had never had custody, sought to block the adoption. (*Id.* at p. 254.) The Supreme Court held that parental rights may sometimes be terminated without any finding of parental unfitness. (*Id.* at pp. 254–255.) But, it also wrote: "We have little doubt that the Due Process Clause would be offended '[if] a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest.' [Citation.] *But this is not a case in which the unwed father at any time had, or sought, actual or legal custody of his child.*" (*Id.* at pp. 254–255, italics added.) *Quilloin* is distinguishable for several reasons. First, as our Supreme Court has explained "[d]ependency proceedings are fundamentally different." (*Guardianship of Ann S.,*

But, that is not the issue before us. Here, father was found to be T.G.'s presumed father and he repeatedly sought custody. The Agency has never challenged the juvenile court's finding that father was T.G.'s presumed father. And, the Agency cites no authority holding that the parental rights of a presumed father who seeks custody can be terminated solely on consideration of the child's best interests. At oral argument, the Agency suggested that this rule should apply simply because the dependency matter was in the permanency planning stage when presumed father status was established.

An argument similar to that raised by the Agency was rejected by the Third District Court of Appeal, in *Z.K., supra,* 201 Cal.App.4th 51. In that case, the mother was not involved in the early stages of the dependency proceeding because her son had been abducted out of state by his father and then removed, due to the father's neglect, without her knowledge. (*Id.* at p. 56.) When the mother learned of the proceeding, weeks before the section 366.26 hearing, she contacted the child protective agency and immediately requested custody. Notwithstanding her status as a nonoffending parent, the social services agency required a home study which was never approved. (*Id.* at pp. 57–62.) Eventually, the juvenile court terminated the mother's parental rights without making any finding that placement with her would be detrimental. (*Id.* at pp. 62–63.)

On appeal, the social services agency argued that the " 'Welfare [and] Institutions Code does not explicitly require a finding of detriment or unfitness for a noncustodial parent at the [section] 366.26 hearing, except for a parent of an Indian child which does not apply here.' " (*Z.K., supra,* 201 Cal.App.4th at p. 66.) The court rejected the argument, reasoning as follows: "The fact that section 366.26—a statutory provision— did not require a finding of detriment here is hardly determinative of whether mother's *constitutional* rights were violated by the termination of her parental rights. Furthermore, from a constitutional perspective, it was exactly *because* mother was not involved in the earlier stages of the proceeding that a specific finding of detriment was needed before her

*supra,* 45 Cal.4th at p. 1133.) More importantly, here, unlike in *Quilloin*, father asserted his interest in custody of T.G. within a month of his birth.

18

rights were terminated at the section 366.26 hearing.  As explained above, the only reason the termination of parental rights at a section 366.26 hearing in a typical dependency proceeding is constitutional is because of the findings that have necessarily been made as to the parent at earlier stages of the proceeding.  Here, no such findings were made as to mother because her whereabouts were unknown and she was not a subject of the earlier stages.  As the department admits, mother 'was not the custodial parent, the child was not removed from her custody and she was not denied placement [at the dispositional hearing].'  Thus, to terminate *her* parental rights at the section 366.26 hearing over her request for custody, a specific finding of detriment, supported by clear and convincing evidence, had to be made.  It was not." (*Z.K.,*at p. 65–66.*)

The *Z.K.* court went on to consider whether it could imply a detriment finding from the record.  "To support the termination of mother's parental rights, the department must point to specific evidence from which we can reasonably imply a finding by the juvenile court that it would be detrimental to place the minor with mother." (*Z.K., supra,* 201 Cal.App.4th at p. 67, italics omitted.)  It observed:  "The social worker's testimony at the section 366.26 hearing in January 2011 that 'the last time [she] had telephone contact with' mother was '[p]robably October or November of . . . 2010,' without more, does not support a finding of detriment.  We do not know why there was no contact, and it cannot be reasonably inferred from the lack of contact by itself that the reason for the lack of contact must reflect something about mother that tends to show it would be detrimental to place the child in her custody.  Given that the department had the burden of proving detriment, any lack of information here has to be held against the department, not against mother." (*Z.K.,* at p. 67, italics omitted.)  " '[I]t is the party opposing placement[, pursuant to section 361.2,] who has the burden to show by clear and convincing evidence that the child will be harmed if the noncustodial parent is given custody.'  (*In re Karla C.*[, *supra,*] 186 Cal.App.4th [at p.] 1243.)" (*Z.K., supra,* 201 Cal.App.4th at p. 69.)

*Gladys L., Frank R.,* and *Z.K.* teach that a court may not terminate a nonoffending, noncustodial mother's or presumed father's parental rights without finding, by clear and

convincing evidence, that awarding custody to the parent would be detrimental.[3] As explained below, the record does not support the Agency's alternative argument that, if any detriment finding was required, the juvenile court made the necessary finding.

The Agency's reliance on *A.S., supra,* 180 Cal.App.4th 351 and *P.A., supra,* 155 Cal.App.4th 1197 is misplaced. In *A.S.,* the father appeared in dependency proceedings involving two children, A.S. and P.S., after they had been removed from their mother's custody for 22 months. After establishing his paternity, he qualified as A.S.'s presumed father and P.S.'s biological father. (*A.S.,* at pp. 354–355.) On appeal, when the father argued that his parental rights had been terminated without adequate findings of unfitness, the reviewing court first noted that because he was only P.S.'s biological father, "the court was not required to make a particularized finding of unfitness or detriment before terminating his parental rights and instead was entitled to focus on P.S.'s best interests." (*Id.* at p. 362.) With respect to A.S., the due process argument was rejected because the court had found, at a disposition hearing, by clear and convincing evidence, that return of the minors to the father would be detrimental. (*Id.* at p. 363.) The court also stated: "To the extent the parties agree this finding was problematic, the record clearly indicates [the father] initially refused to participate in dependency proceedings, his whereabouts were unknown for a substantial period and he did not visit the children for more than six months. Although the better practice would have been for the court to have explicitly made these findings at one or more of the previous hearings,

---

[3] To the extent *Gladys L.* suggests that a finding of a parent's unfitness may not be had absent the sustaining of a petition against that parent, we do not agree. "[A] child may be declared a dependent if the actions of either parent bring the child within the statutory definitions of dependency. [Citations.] Additionally, a jurisdictional finding is not an adequate finding of parental unfitness because it is made by a preponderance of the evidence. [Citations.] Therefore, even if the dependency petition had alleged [the father's] unfitness, the order sustaining the petition would [be] inadequate, by itself, to terminate [the father's] parental rights without a subsequent finding of detriment by clear and convincing evidence." (*P.A., supra*, 155 Cal.App.4th at p. 1212, italics omitted; accord, *A.S., supra,* 180 Cal.App.4th at p. 361.)

there is no doubt these circumstances made the children's placement with, or return to, [the father's] custody detrimental to the children." (*Ibid.*)

In *P.A.*, the presumed father knew about the dependency case, involving his daughter for months, but ignored the notices he received. (*P.A., supra,* 155 Cal.App.4th at pp. 1199–1200, 1204.) The father also never requested reunification services and never filed a section 388 petition seeking custody of his daughter. Instead, he made only a perfunctory request that she be placed with him in his mother's home. (*Id.* at p. 1209.) At the time of the section 366.26 hearing, the father argued only that the court was not free to terminate parental rights because no petition, alleging he was unfit, was ever filed. (*Id.* at pp. 1210–1212.)

The Second District Court of Appeal held that the required finding of detriment was made by the necessary standard, as to the father, where the juvenile court found at the disposition hearing "by 'clear and convincing evidence there exist[ed] a substantial danger to the children and [there was] no reasonable means to protect them without removal from *the parents'* custody' " (*P.A., supra,* 155 Cal.App.4th at p. 1212) and removed the children from *the parents'* custody. (*Ibid.*) The father's failure to take responsibility for his child and his failure to maintain contact with her constituted substantial evidence to support the detriment findings. (*Id.* at pp. 1212–1213.)

Here, in marked contrast to both *A.S.* and *P.A.*, the juvenile court was clear, in its disposition findings, that T.G.'s welfare required removal only from mother's custody. The Agency does not contend that the juvenile court made the necessary detriment finding, at either the section 366.26 hearing or the disposition hearing. Instead, the Agency points to the fact that the juvenile court sustained the section 300, subdivision (g), allegation at the jurisdiction hearing. But, father was not named in the dependency petition. And, in any event, "a jurisdictional finding is not an adequate finding of parental unfitness because it is made by a preponderance of the evidence." (*P.A., supra*, 155 Cal.App.4th at p. 1212, italics omitted; accord, *A.S., supra,* 180 Cal.App.4th at p. 361.)

21

Next, the Agency points to the fact that the juvenile court found that "[T.G.'s] placement [was] necessary and appropriate" at the initial section 366.26 hearing, held on June 3, 2009. The juvenile court also found that "removal of [T.G.] from the custody of his [guardians] would be detrimental to [his] emotional well-being . . . ." It is true that the juvenile court did not specify that these findings applied only to mother. But, we cannot imply a finding of detriment as to father because, in June 2009, father had not yet been declared a presumed father. Thus, even absent a finding of detriment, father had no entitlement to custody of T.G. at that time. (See *In re Zacharia D., supra,* 6 Cal.4th at p. 449 ["both the mother and presumed father, but not the natural father, 'are *entitled* to custody of their minor children' "]; *In re Christopher M.* (2003) 113 Cal.App.4th 155, 160 ["[u]nless and until appellant was able to elevate his status to that of a biological or presumed father, the only issues on which he was entitled to assert a position concerned his paternal status and his intent and desires regarding the minor if his paternal status became more than just a potentiality"].)

Finally, the Agency points to the following statement by the juvenile court, at the hearing in which the court reconsidered its ruling granting father reunification services: "I put too much importance on [father's] desires to step up to be a father. That is not what the law requires in this instance. It's what's in the best interest of the child and whether or not there is a beneficial parent relationship that would be in the best interest of . . . the child. There is no evidence of that. There is . . . no question that this gentleman wants to be the father, that he is visiting, but there is no evidence . . . that it would be in the best interest to continue the parental relationship at this time."

It appears that there was some confusion regarding the appropriate standard to be applied to father's request to change the court's order on reunification services. The juvenile court appears to have ultimately relied on *In re Vincent M.* (2008) 161 Cal.App.4th 943 and *In re Zacharia D., supra,* 6 Cal.4th 435, which held that a biological father, who does not come forward and assert paternity until the end of the reunification period, has the burden to show changed circumstances and that reunification services are in the child's best interests. (*In re Vincent M.,* at pp. 955–956; *In re*

22

*Zacharia D.,* at pp. 453–455.) Arguably these cases were inapplicable. Both involved fathers who did not assert paternity until the end of the reunification period and who never obtained presumed father status. In contrast, father came forward at the beginning of T.G.'s dependency and was deemed T.G.'s presumed father in November 2009.

In any event, the court made clear that it only reconsidered its previous ruling to grant father reunification services because it was convinced it had committed an error of law. Although the court clearly found that it was not in T.G.'s best interests to grant father reunification services, it did not consider the separate question of whether placement with father would be detrimental.

We cannot imply that the court found placement with father would be detrimental, when it had previously stated on the record: "[E]ven when in the company of the father, there is no risk that has been mentioned or brought up in evidence either through the father's testimony, and in cross-examination, or through any of the reports, at least it hasn't been pointed out to me. [¶] The largest concern I have about the father is his representation that he has been a successful parent, and obviously that is questionable given the number of children he's had who have been through the system one way or the other, or permanently planned either adopted or dependent. So the court has some concern about his parenting skills, though that wasn't fully developed. [¶] Looking at the second purpose of providing services to the family to preserve the family or reunify with the family . . . this is not a matter of termination of family reunification services by the father . . . by anything that he did such as being abusive, neglectful, or not visiting with his child. To the contrary, . . . [¶] he has done nothing to cause the break up of the family."

We are mindful of the fact that, by the time of termination of father's parental rights, T.G. had been living with S.T. and K.B. for over two years and that he has a compelling interest in stability and permanency. But we can find no evidence in this record to support even an implied detriment finding. In *A.S., supra,* 180 Cal.App.4th 351 and *P.A., supra,* 155 Cal.App.4th 1197, detriment findings were implied because both fathers had persistently sought to avoid responsibility for their children and failed to visit

for long stretches at a time.  Here, on the other hand, the juvenile court acknowledged that father stepped forward when T.G. was only one month old and had consistently visited with him until recently.  One could reasonably infer that visitation broke down because father did not take his parental role seriously.  But, one could also reasonably infer that visitation was interrupted because S.T. and K.B. reneged on their agreement to transport T.G. home from Oakland and because father was unable to afford the train fare in both directions to and from Sacramento.  There was a passing suggestion that father had previously had his parental rights terminated as to other children.  However, the juvenile court itself concluded that evidence on this issue had not been "fully developed." On this record, we cannot imply a finding, supported by clear and convincing evidence, that placement with father would be detrimental.  (See *Frank R., supra,* 192 Cal.App.4th at p. 539; *Z.K., supra,* 201 Cal.App.4th at pp. 66–69.)  The juvenile court's order terminating father's parental rights must be reversed.

## IV.  DISPOSITION

The order terminating T.B.'s parental rights is reversed.  The case is remanded to the juvenile court to determine whether, based on the facts as they exist at this time, a finding of unfitness may be made by clear and convincing evidence and to thereafter make such other orders as are necessary and appropriate.

_____

Bruiniers, J.

We concur:

_____

Jones, P. J.

_____

Simons, J.