Filed 3/21/16  In re M.V. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FOURTH APPELLATE DISTRICT

### DIVISION THREE

| | |
|---|---|
| In re M.V., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>J.E.,<br><br>    Defendant and Appellant. | G052411<br><br>(Super. Ct. No. DP025729)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Dennis J. Keough, Judge.  Affirmed.

Robert McLaughlin, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, Karen L. Christensen and Jeannie Su, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for Minor.

\*        \*        \*

# I.

## INTRODUCTION

J.E. is the alleged father, and, we will assume, the biological father of M.V., who was born in December 2014. J.E. appeals from the juvenile court's order under Welfare and Institutions Code section 366.26[1] terminating his parental rights. M.V.'s mother is not a party to the appeal. J.E. contends the juvenile court erred and violated his due process rights by terminating his parental rights without making a finding that placement with him would be detrimental to M.V. The juvenile court was not required to make a finding of detriment because J.E. was not a presumed father and, we conclude, did not qualify as a father within the meaning of *Adoption of Kelsey S.* (1992) 1 Cal.4th 816 (*Kelsey S.*) and *In re Zacharia D.* (1993) 6 Cal.4th 435, 451 (*Zacharia D.*). We therefore affirm.

# II.

## FACTS AND PROCEDURAL HISTORY

A. *Detention*

M.V. was born prematurely in December 2014. At the time of birth, he weighed less than three pounds and tested positive for methamphetamines. M.V.'s mother, G.V. (Mother), told a social worker she had used methamphetamines about four to five days before giving birth to M.V. Mother previously had lost custody of three children due to her unresolved substance abuse issues. Two of those children were born with positive toxicology screens for methamphetamines and/or amphetamines. Mother failed to reunify with all three children, and they ultimately were adopted.

Mother had never been married. Three days after giving birth to M.V., Mother told the social worker his father had the first name "Joe." Mother had no other identifying or contact information for the father.

---

[1] Code references are to the Welfare and Institutions Code unless otherwise cited.

M.V. was taken into protective custody four days after birth. Two days after M.V. was taken into protective custody, the Orange County Social Services Agency (SSA) filed a juvenile dependency petition under section 300, subdivisions (b) and (j). With respect to M.V.'s then unknown father, the petition made one allegation: "b-7. The identity and whereabouts of the alleged father are unknown, although [M]other believed his first name is 'Joe.' The alleged father has not provided for the safety, support or protection of the child, and is not available to provide appropriate care."

At a detention hearing in December 2014, the juvenile court detained M.V. No parent appeared at the hearing.

B. *Jurisdictional Hearing*

In January 2015, SSA filed its jurisdiction/disposition report. SSA recommended that the court sustain the petition, declare M.V. a dependent child of the court, remove him from Mother's custody, and deny Mother reunification services pursuant to section 361.5, subdivisions (b)(1), (7), (10), (11), and (13). At the same time, SSA filed a declaration of due diligence documenting its unsuccessful efforts, based upon the information Mother had provided, to locate M.V.'s father.

As of the date of SSA's jurisdiction/disposition report, M.V. was still in the hospital neonatal intensive care unit. The report identified M.V.'s alleged father as "Joe Unknown" with no other information about him. According to the report, a hospital nurse had told the public health nurse that Mother brought a man to visit M.V. and claimed the man was M.V.'s father. The hospital nurse was instructed by the public health nurse that only Mother and M.V.'s maternal aunt were permitted to visit M.V. and the father was not permitted to visit until he had presented himself in court. The jurisdiction/disposition report also noted that M.V.'s maternal aunt had told the social worker, on December 30, 2014, that "the alleged father, Joe, has been calling her home."

The social worker asked the maternal aunt to give the alleged father the social worker's name and telephone number and to ask him to call the social worker.

At the jurisdictional hearing on January 7, 2015, Mother's counsel informed the court that Mother believed "Joe" to be M.V.'s biological father. Mother and the father met at a hotel party in June 2014. The only information known about the father was his first name was "Joe," Mother last had contact with him six days earlier, he "hangs out in Tustin on First Street," and "[h]e is African-American, brown eyes, five-seven, about 150 pounds, and about 30 years old." We will consider the father described at the hearing to be J.E. and henceforth refer to him as J.E.

Mother's counsel stated that J.E. was not named on M.V.'s birth certificate, had not signed a declaration of paternity, and had not provided any kind of support for M.V. Mother did not know J.E.'s address or any social media contact information. Mother stated that J.E. became aware she was pregnant about two weeks before she went into labor. Mother, who was in custody, claimed to have J.E.'s telephone number at her house. The court directed Mother, upon her release from custody, to provide J.E.'s telephone number to SSA and directed SSA to "follow up with efforts to identify and notice Joe." The hearing was continued to January 21, 2015.

On January 13, 2015, M.V. was released from the hospital and placed with a maternal aunt. In an addendum report dated January 21, 2015 (the January 21 Report), SSA reported Mother recently had been in contact with J.E., who had told Mother he wanted to visit M.V.

No parent was present at the continued jurisdictional hearing on January 21, 2015. The juvenile court found that SSA had exercised due diligence in its efforts to locate J.E. Default was entered against J.E. The court found the allegations of the petition to be true by a preponderance of the evidence and declared M.V. to be a dependent child of the court under section 300, subdivisions (b) and (j). A dispositional hearing was set for February 4, 2015.

4

C. *Dispositional Hearing*

In an addendum report dated February 4, 2015 (the February 4 Report), the social worker reported she had received a voicemail message from M.V.'s alleged paternal grandfather (J.E., Sr.) on January 23. When the social worker returned the call three days later, J.E., Sr., provided her with J.E.'s full name, date of birth, and mailing address. J.E., Sr., reported that J.E. was homeless and did not have a telephone. The social worker told J.E., Sr., about the dispositional hearing and asked him to have J.E. contact her to set up an appointment. J.E., Sr., agreed.

On January 26, 2015, the social worker sent a certified/return receipt letter to J.E. at the address given by J.E., Sr. The letter informed J.E. of the upcoming dispositional hearing on February 4, advised him to contact SSA, and included a resource and referral packet. There is no signed certified return receipt in the appellate record.

Neither Mother nor J.E. appeared at the dispositional hearing on February 4, 2015. The juvenile court denied a request by Mother's counsel for a continuance to locate Mother. The court was informed that J.E. had a case pending in criminal court but was no longer in custody. The court acknowledged the social worker's contact with J.E., Sr., the mailing of notice to J.E., the fact that J.E. was homeless and received mail at J.E., Sr.'s address, and the certified letter sent to that address. The court also acknowledged that J.E., Sr., had been asked to have J.E. contact SSA. Counsel for SSA stated there had been no indication that J.E. had contacted SSA. The bailiff reported that J.E. had been released from custody on January 15, 2015. The court directed SSA to inform J.E. of the nature of the proceedings and his right to counsel.

The court received in evidence the SSA jurisdiction/disposition report, the declaration of due diligence, the January 21 Report, and the February 4 Report. The court declared M.V. a dependent child and vested custody with SSA. The court found, by clear and convincing evidence, that to vest custody with the parents would be detrimental to M.V. and that his welfare required that custody be taken from his parents.

5

The court directed SSA to make any needed search referrals to the search unit.  The court set a hearing under section 366.26 and denied reunification services for Mother.

The juvenile court found J.E. to be M.V.'s alleged father and ordered SSA to provide notice of the section 366.26 hearing to J.E. at the address given in the February 4 Report (J.E., Sr.'s address).  SSA mailed notice to that address, and notice was served by substituted service on J.E., Sr., on February 18, 2015.  On March 4, 2015, the court found SSA had exercised due diligence in its efforts to locate Mother and J.E. and "good notice" had been given to both of them.

D.  *Section 366.26 Reports and Initial Section 366.26 Hearing*

In preparation for the section 366.26 hearing, scheduled for June 4, 2015, SSA submitted a report on May 19, 2015 (the Section 366.26 Report).  In the Section 366.26 Report, SSA recommended that the court find M.V. adoptable, terminate parental rights, and refer him for adoptive placement.  In February 2015, M.V. had been placed with foster parents, T.B. and G.B.  M.V. was doing well in their care and presented no physical, mental, emotional, or developmental concerns.  T.B. and G.B. were committed to adopting M.V.

According to the Section 366.26 Report, J.E. first contacted the social worker on May 2, 2015 and asked about visiting M.V.  The social worker gave J.E. the date and time of the next court hearing (June 4, 2015) and advised him to be present.  The social worker reported that both Mother and J.E. had unresolved substance abuse histories and were living transient lifestyles.  Mother's whereabouts were unknown.

J.E. appeared in court for the first time at the section 366.26 hearing on June 4, 2015.  The juvenile court appointed counsel to represent J.E., who denied the allegations of the dependency petition and filed a "Parental Notification of Indian Status" (Judicial Council form ICWA-020) denying Indian heritage.  J.E.'s counsel stated that J.E. believed he was M.V.'s biological father because he had been in a relationship with

6

Mother, she had told him he was the father, and he had visited M.V. in the hospital shortly after he was born. J.E. had had no contact with M.V. since that visit, had lost contact with Mother, and claimed to be unaware of the dependency case.

The juvenile court granted J.E.'s request for visitation, authorized J.E. to have a minimum of two one-hour visits with M.V., and directed J.E. to submit to drug testing. The court also granted J.E.'s request for a paternity test and authorized funds for that purpose. The section 366.26 hearing was trailed to July 28, 2015, and J.E. was ordered to return for that hearing without further order or notice.

In advance of the Section 366.26 hearing, SSA submitted an addendum report dated July 28, 2015 (the July 28 Report) recommending that the court terminate parental rights as to both Mother and J.E. and place M.V. for adoption. M.V. remained placed with T.B. and G.B.

According to the July 28 Report, J.E. visited M.V. on June 26 and July 9. J.E. arrived on time for and acted appropriately at both visits. He held M.V. during most of the June 26 visit, spoke with T.B. and G.B. about M.V.'s routine, and thanked them for caring for M.V. For the July 9 visit, J.E. brought M.V. a toy and had T.B. take photographs of him holding M.V. T.B. showed J.E. videos on her cellular phone of M.V. laughing and gave J.E. photographs of M.V. For most of the visit, J.E. held M.V. and walked around the meeting room with him. At the end of the visit, J.E. thanked T.B. for the photographs and for caring for M.V. Afterwards, in a private conversation with the social worker, J.E. said he was on probation, was actively looking for a job, lived at a sober living home, and had last used drugs in February 2015. J.E. told the social worker his desire was to gain custody of M.V.

On July 6 and 13, 2015, J.E. submitted negative drug tests. On July 14, paternity testing established that J.E. was M.V.'s biological father.

7

E. *Termination of Parental Rights*

The section 366.26 hearing recommenced as scheduled on July 28, 2015. J.E. was not present. The juvenile court denied his counsel's request for a continuance. The court received the Section 366.26 Report and the July 28 Report in evidence. J.E.'s counsel submitted on the record. The court found that SSA had provided both Mother and J.E. adequate notice of the hearing, determined that M.V. was likely to be adopted, placed M.V. for adoption, granted T.B and G.B's request for de facto parent status, and terminated parental rights as both Mother and J.E. pursuant to section 366.26.

When J.E. appeared in court later, during the afternoon of July 28, the juvenile court recalled the case. The court relieved J.E.'s counsel, who had declared a conflict, and appointed new counsel to represent J.E. New counsel asked for a transcript of the June 4, 2015 segment of the section 366.26 hearing.

A status review hearing was conducted on July 30. The court set a progress review hearing for August 11, 2015, to address the matter of obtaining a transcript of the June 4 hearing. At the August 11, 2015 progress review hearing, the court noted that the June 4, 2015 transcript had been received and reviewed by all counsel and filed with the court. J.E.'s counsel addressed the court, and two letters written by J.E. were reviewed by the court and counsel. The court ruled that the prescheduled adoption review and periodic review hearings remain set as scheduled. J.E. filed a timely notice of appeal from the order terminating parental rights.

### III.

### THE JUVENILE COURT WAS NOT REQUIRED TO MAKE A FINDING OF DETRIMENT TO THE CHILD BEFORE TERMINATING J.E.'S PARENTAL RIGHTS TO M.V.

J.E. contends the juvenile court erred and violated his due process rights by terminating his parental rights to M.V. without making a finding, by clear and convincing

8

evidence, that placement with J.E. would be detrimental to M.V. Although J.E. did not have presumed father status, he argues he qualified as a *Kelsey S.* father and, therefore, the juvenile court could not terminate parental rights without making a finding of detriment.

A. *Legal Framework*

California law divides fathers into four categories: de facto fathers, alleged fathers, biological or natural fathers, and presumed fathers. (*In re Jerry P.* (2002) 95 Cal.App.4th 793, 801.) A man who has assumed the role of parent is a "'de facto father.'" (*Ibid.*) A man who might be the father but has not been established to be the natural or presumed father is an "'alleged father.'" (*Ibid.*) A man who has been established to be the biological father, but who has not achieved the status of presumed father, is a biological or natural father. (*Ibid.*; see *Zacharia D.*, *supra*, 6 Cal.4th at p. 449, fn. 15.) A man who has satisfied the conditions of Family Code section 7611 is a presumed father. (*In re Jerry P.*, *supra*, at p. 801 & fn. 11.) "A 'natural father' can be, but is not necessarily, a 'presumed father' and a 'presumed father' can be, but is not necessarily, a 'natural father.'" (*Id.* at p. 801.)

Although J.E. never sought biological father status, the results of the paternity testing are undisputed, so we will assume for the sake of argument he is M.V.'s biological father. J.E. is not a presumed father because he never attempted to satisfy the conditions of Family Code section 7611.[2] J.E. concedes he did not qualify as M.V.'s presumed father.

A biological father's desire to establish a personal relationship with the child is not in itself a fundamental liberty interest protected by due process. (*In re T.G.*

---

[2] A man who has neither legally married nor attempted to legally marry the mother of his child cannot become a presumed father unless he "receives the child into his . . . home and openly holds out the child as his . . . natural child." (Fam. Code, § 7611, subd. (d); see *Adoption of Michael H.* (1995) 10 Cal.4th 1043, 1051.)

(2013) 215 Cal.App.4th 1, 5.)  A biological father who has not achieved presumed father status is not entitled to receive reunification services.  (*Ibid.*)  The rights of a biological father are limited to establishing his right to presumed father status.  (*In re A.S.* (2009) 180 Cal.App.4th 351, 362.)  "[T]he court does not err by terminating a biological father's parental rights when he has had the opportunity to show presumed father status and has not done so."  (*Ibid.*)

The juvenile court cannot terminate parental rights of a presumed father without finding, by clear and convincing evidence, that placement with the father would be detrimental to the child.  (*In re T.G.*, *supra*, 215 Cal.App.4th at p. 5; *In re A.S.*, *supra*, 180 Cal.App.4th at p. 362.)

The juvenile court must make the same particular finding of detriment to the child before terminating the parental rights of a *Kelsey S.* father.  (*In re T.G.*, *supra*, 215 Cal.App.4th at p. 5.)  In *Kelsey S.*, *supra*, 1 Cal.4th at page 849, the California Supreme Court held the equal protection and due process clauses of the United States Constitution guarantee an unwed, natural father the right to veto an adoption by withholding consent if the father meets certain conditions.  "If an unwed father promptly comes forward and demonstrates a full commitment to his parental responsibilities— emotional, financial, and otherwise—his federal constitutional right to due process prohibits the termination of his parental relationship absent a showing of his unfitness as a parent."  (*Ibid.*)  In *Zacharia D.*, *supra*, 6 Cal.4th at page 451, the court extended *Kelsey S.* to apply in juvenile dependency proceedings.  (See *In re Jason J.* (2009) 175 Cal.App.4th 922, 932-933, fn. 6; *In re Julia U.* (1998) 64 Cal.App.4th 532, 535.)

B.  *Forfeiture*

J.E. did not ask the juvenile court to declare him a *Kelsey S.* father.  Neither does he assert the juvenile court could not terminate his parental rights without making a finding of detriment to M.V.  SSA contends J.E. thereby forfeited those claims.

10

In dependency litigation, "[a] party forfeits the right to claim error as grounds for reversal on appeal when he or she fails to raise the objection in the trial court." (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 221.) A father seeking *Kelsey S.* or presumed father status must first make the request to the juvenile court. (*In re Jason J.*, *supra*, 175 Cal.App.4th at p. 932; *In re Elijah V.* (2005) 127 Cal.App.4th 576, 582.) "A 'party seeking status as a father under *Kelsey S.* must be clear he wants to be so declared.' [Citation.]" (*In re Jason J.*, *supra*, at p. 932.)

Although we agree J.E. forfeited his claim to be a *Kelsey S.* father, we address the issue because of the significant rights implicated here and because, as J.E. asserts, we can resolve the issue as a pure question of law.

C. *J.E. Does Not Qualify as a* Kelsey S. *Father.*

"A biological father may be accorded parental rights and become a *Kelsey S.* father when his attempt to achieve presumed parent status under [Family Code] section 7611, subdivision (d) is thwarted by a third party and he made 'a full commitment to his parental responsibilities—emotional, financial, and otherwise.' [Citations.] We consider his conduct before and after the child's birth, including whether he publicly acknowledged paternity, paid pregnancy and birth expenses commensurate with his ability to do so, and promptly took legal action to obtain custody of the child. [Citation.] He must demonstrate a full commitment to his parental responsibilities within a short time after he learned that the biological mother was pregnant with his child. [Citation.] He must also demonstrate a willingness to assume full custody." (*In re Elijah V.*, *supra*, 127 Cal.App.4th at p. 583.)

On the evidence presented to the juvenile court, J.E. did not as a matter of law qualify as a *Kelsey S.* father. J.E. never attempted to achieve presumed father status under Family Code section 7611 and, accordingly, nobody could have thwarted any such attempt. All that the record reveals about J.E.'s conduct before M.V.'s birth was

11

Mother's statement at the January 7, 2015 hearing that J.E. had been made aware she was pregnant about two weeks before she went into labor. There is no evidence in the record of J.E. demonstrating any degree of commitment to his parental responsibilities after learning Mother was pregnant with his child. J.E. visited M.V. in the hospital soon after he was born, but at that time made no public acknowledgment of paternity. There is no evidence that J.E. paid pregnancy and birth expenses commensurate with his ability to pay, made any kind of an emotional commitment to M.V., or took on any paternal obligations.

At the dispositional hearing, the juvenile court acknowledged that J.E. was homeless and received mail at J.E., Sr.'s address, and that notice of the dispositional hearing had been sent by certified mail to that address. There was no indication that J.E. had contacted SSA. A declaration of due diligence, filed on March 2, 2015, set forth in detail SSA's exhaustive attempts to locate J.E.'s whereabouts, and the juvenile court found that SSA had exercised due diligence in its efforts to locate and provide J.E. notice.

J.E. came forward and appeared in court on June 4. He had two visits with M.V., and, at both visits, behaved appropriately. After the second visit, J.E. told the social worker he wanted to obtain custody of M.V. But two successful one-hour-long visits, and the expression of a desire to obtain custody, over six months after the child was born, are not a demonstration of "'a full commitment to his parental responsibilities—emotional, financial, and otherwise'" or of a "willingness to assume full custody." (*In re Elijah V.*, *supra*, 127 Cal.App.4th at p. 583.)

J.E. was neither a presumed father nor a *Kelsey S.* father. The juvenile court therefore was not required to make a finding of detriment to the child before terminating J.E.'s parental rights to M.V.

## IV.

### DISPOSITION

The order terminating parental rights is affirmed.


FYBEL, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


IKOLA, J.