Filed 6/23/14  In re J.B. CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re J.B., A Person Coming Under the Juvenile Court Law. | B252106 |
| | (Los Angeles County Super. Ct. No. CK60203) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. ALONZO B., Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Emma Castro, Juvenile Court Referee.  Affirmed.

William Hook, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Jeanette Cauble, Deputy County Counsel, for Plaintiff and Respondent.

_____

Appellant Alonzo B. appeals from the juvenile court's orders terminating his parental rights over his alleged son, J.B., pursuant to Welfare and Institutions Code[1] section 366.26 and selecting a non-relative adoption as the child's permanent plan. Alonzo argues that the juvenile court erred by failing to provide him with proper notice of the dependency proceedings and an opportunity to appear, and failing to ensure that a paternity test previously ordered was administered. Alonzo asserts that these alleged errors deprived him of his constitutional right to due process because they precluded him from elevating his paternity status, obtaining reunification services, and pursuing a relative placement for his son. We conclude that any errors committed by the juvenile court were harmless under the circumstances of this case, and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.  Section 300 Petition

This matter came to the attention of the Department of Children and Family Services (DCFS) on January 29, 2012 following a referral alleging that Dionne B. (Mother) had abandoned her then 10-month-old son, J.B. (born March 2011), at a church. Mother initially denied that J.B. was her son, but later admitted that she had left him at the church because she believed he was a "devil child." She was arrested and charged with child endangerment. In an interview with the DCFS, Mother indicated that she no longer wanted J.B. because he was the product of an affair with a married man. She identified Alonzo as J.B.'s father and stated that his whereabouts were unknown. J.B. was taken into protective custody and placed in foster care.

On February 1, 2012, the DCFS filed a dependency petition on behalf of J.B. under section 300, subdivision (b), which alleged that Mother had mental and emotional problems that rendered her unwilling and unable to provide J.B. with appropriate parental care. On February 2, 2012, the juvenile court ordered that J.B. be detained from Mother

---

[1]  Unless otherwise stated, all further statutory references are to the Welfare and Institutions Code.

and placed in foster care. The court also ordered the DCFS to present evidence at the next hearing of due diligence in attempting to locate Alonzo. The matter was set for a pretrial resolution conference on March 1, 2012.

## II. Jurisdiction and Disposition Hearing

For its March 1, 2012 jurisdiction/disposition report, the DCFS interviewed Mother who remained incarcerated. Mother admitted that she previously had been diagnosed with bipolar disorder and schizophrenia, and was not currently taking any medication. She denied that she had abandoned J.B. at the church and stated that she now wanted to care for the child. She also reported that she did not have any relatives with whom J.B. could be placed. Mother was unable to provide the DCFS with Alonzo's full name or date of birth. She said that Alonzo was arrested when she was three months pregnant and she believed he was still incarcerated in Las Vegas. The DCFS attached a due diligence declaration to its report which indicated that efforts to locate Alonzo had been unsuccessful and his whereabouts remained unknown. The agency recommended that J.B. be declared a dependent of the court and that family reunification services be offered to Mother, but not to Alonzo.

According to a parentage questionnaire completed by Mother on March 1, 2012, Alonzo was J.B.'s father. Alonzo was not present at J.B.'s birth, was not married to Mother or living with her at the time of the birth, and was not identified as the child's father on the birth certificate. Mother reported that Alonzo openly held himself out as J.B.'s father, but he never received the child into his home or provided for his needs. She denied that a paternity test was ever performed. At the March 1, 2012 pretrial resolution conference, the juvenile court found that Alonzo was the alleged father of J.B. based on Mother's responses to the parentage questionnaire. The court also found that notice of the proceedings had not been given to Alonzo and ordered the DCFS to complete a due diligence search on him. The pretrial resolution conference was continued to April 10, 2012, and a jurisdiction hearing was set for May 15, 2012.

3

In a April 10, 2012 supplemental report, the DCFS stated that Alonzo had contacted the agency in response to a letter sent through the due diligence search. In an interview with the case social worker, Alonzo indicated he currently was incarcerated at a fire camp following a conviction for narcotics sales. His most recent arrest was on September 2, 2010 and he was due to be released on October 7, 2012. Alonzo stated that he had a casual sexual relationship with Mother in the past and learned she was pregnant shortly before his arrest. He acknowledged that he held himself out to be J.B.'s father, but never had any contact with the child. He was open to taking a paternity test if ordered by the court. Alonzo reported that he did not have any relatives with whom J.B. could be placed. He was informed of the next scheduled hearing by the case social worker, and indicated that he did not want to attend the hearing because he would lose his placement at the fire camp. The case social worker sent Alonzo a Judicial Council JV-450 Waiver of Appearance form for both the April 10, 2012 and May 15, 2012 hearings, and Alonzo returned signed forms waiving his right to attend each hearing and requesting that an attorney be appointed to represent him.

In its supplemental report, the DCFS related that another man also had come forward to claim that he might be the biological father of J.B. Da Juan Y. reported that he and Mother had lived together from 2009 until shortly after J.B.'s birth, and that Mother had admitted she had an affair during their relationship and did not know who the father was. In a follow-up interview with the DCFS, Mother maintained that J.B.'s father was Alonzo, not Da Juan. She also stated that she had been placed on probation, and ordered to complete a parenting class. Although Mother was prescribed psychotropic medication during her incarceration, she stopped taking it after her release. The DCFS advised the court that both Alonzo and Da Juan were requesting a paternity test to determine J.B.'s biological parentage, and recommended that the court order a paternity test for both men. At the April 10, 2012 pretrial resolution conference, the juvenile court appointed counsel to represent Alonzo.

The jurisdiction and disposition hearing was held on May 15, 2012. Alonzo had waived his appearance at the hearing, but his appointed counsel appeared on his behalf.

4

The juvenile court sustained the petition as amended based on a finding that Mother had been diagnosed with schizophrenia, and as a result of not taking her necessary medication, she experienced a psychotic episode and abandoned J.B. The court declared J.B. a dependent of the court under section 300, subdivision (b), and ordered that the child be removed from Mother's custody and remain suitably placed in foster care. Mother was granted reunification services and monitored visitation with J.B. The court noted that Alonzo was an alleged father only, was currently incarcerated, and was not asking for custody of J.B. The court found that placement of J.B. with Alonzo would be detrimental to the child's safety and well-being, and denied Alonzo reunification services pursuant to section 361.5, subdivision (a). Alonzo was granted monitored visitation upon his release from custody. The court also advised the parties that it would sign an order for paternity testing if one was submitted by counsel for the DCFS. Although it was not noted in the court's May 15, 2012 minute order, a written order for paternity testing of both Alonzo and De Juan was signed by the court that same day. The matter was set for a six-month review hearing on November 13, 2012.

### III.    Section 366.21 Review Hearings

In its November 13, 2012 status review report, the DCFS advised the juvenile court that J.B. was doing well in foster care. Mother had been in partial compliance with her case plan, but was arrested for battery on a police officer on August 30, 2012 and had been incarcerated since that date. The DCFS reported that Alonzo's current whereabouts were unknown without noting whether he had been released from custody. Although the agency stated that notice of the six-month review hearing had been sent to both Mother and Alonzo via first class mail, a copy of the notice to Alonzo was not attached to the report. At the six-month review hearing, Alonzo's attorney appeared on his behalf and was relieved from further representation. The juvenile court found that Mother was not in compliance with her case plan and continued jurisdiction over J.B. was necessary. The 12-month review hearing was set for April 2, 2013.

5

In its April 2, 2013 status review report, the DCFS stated that J.B.'s current caretakers were not willing to commit to a permanent plan for the child and the agency was actively searching for an adoptive home. Mother had been released from jail on February 6, 2013 and was in minimal compliance with her case plan. Alonzo had not had any contact with J.B. The DCFS noted that Alonzo's whereabouts were still unknown and an updated due diligence search would be submitted. The agency did not, however, send notice of the review hearing to Alonzo's last known address. At the 12-month review hearing, the juvenile court terminated Mother's reunification services and ordered permanent placement services for J.B. Alonzo did not attend the hearing and an attorney was not appointed to represent him. The court set a section 366.26 selection and implementation hearing for July 30, 2013.

## IV.    Section 366.26 Selection and Implementation Hearing

In its July 30, 2013 section 366.26 report, the DCFS informed the juvenile court that J.B. had met with his prospective adoptive parents, Mr. and Mrs. M., on July 9, 2013. He had a series of pre-placement visits with the family, which went very well, and was placed in their home on July 19, 2013. Mr. and Mrs. M. had three children, including two adopted children, and were committed to providing J.B. with a safe and nurturing home. The DCFS reported that both Mother and Alonzo currently were incarcerated, but did not indicate whether Alonzo had been continuously incarcerated since 2010 or had been released and then arrested again. Both Mother and Alonzo were personally served with notice of the section 366.26 hearing in early June 2013. The DCFS recommended that the juvenile court terminate parental rights over J.B. with adoption as the permanent placement goal, but that the matter be continued for the completion of an adoptive home study for Mr. and Mrs. M.

On July 30, 2013, the juvenile court held the section 366.26 hearing. Both Mother and Alonzo attended the hearing, and Alonzo's former counsel was reappointed to represent him. As reported by his attorney, Alonzo had been aware of the dependency proceedings for about a year, but he had not understood the ramifications of waiving his

6

appearance at the prior hearings. Alonzo now regretted that decision and was requesting a visitation order despite never having met J.B. The court stated that it would not require the DCFS or the prospective adoptive parents to take J.B. to visit Alonzo in jail, but it would ask the DCFS to send Alonzo a picture of the child. Mother advised the court that she had been sentenced to four and a half years in state prison, and requested for the first time that her second cousins, Jerry and Brandi B., be considered for a relative placement. The juvenile court continued the hearing to October 1, 2013 for completion of the adoptive home study and ordered the DCFS to assess Mother's cousins for possible placement if Mother provided their contact information.

In its October 1, 2013 status review report, the DCFS stated that J.B. had adjusted well to his prospective adoptive home and that an approved home study had been completed for Mr. and Mrs. M., who remained committed to moving forward with the adoption. The DCFS reported that it had been unable to assess Mother's cousins for a possible relative placement because Mother failed to provide their contact information and simply said that she thought it was a "waste of time" to do so. Both Mother and Alonzo remained incarcerated and had not had any contact with J.B. Mother told the DCFS that she wanted the best for J.B. and asked that his adoptive parents send her pictures of the child from time to time. Notice of the continued section 366.26 hearing was served on both Mother and Alonzo via first class mail.

On October 1, 2013, the date of the continued hearing, Alonzo filed a section 388 petition in which he requested that the paternity test previously ordered for him be performed and that Jerry and Brandi B. be assessed for placement of J.B. The petition alleged that it was in J.B.'s best interest to know his biological father and to be placed with relatives who could provide him with family history and identity.

Alonzo and his counsel appeared at the continued section 366.26 hearing. Mother waived her appearance; her counsel attended the hearing on her behalf. With respect to Alonzo's request for a relative placement, his attorney informed the court that the proposed caretakers, Jerry and Brandi B., were actually Alonzo's brother and sister-in-law rather than Mother's cousins. The attorney provided the court with their contact

information and indicated that they were interested in having J.B. placed in their home. With respect to Alonzo's request for paternity testing, the attorney stated that she believed the court had ordered a paternity test at the May 15, 2012 jurisdiction and disposition hearing, but she was not certain because the test was not noted in the court's minute order. The attorney asked the court to either order that the paternity test be performed, or grant a continuance so that the parties could review the reporter's transcript from the hearing to determine whether the test was ever ordered.

The juvenile court denied Alonzo's section 388 requests. The court found that J.B.'s current adoptive home was the appropriate placement for the child given his need for stability and continuity of care, and explained that if Alonzo wanted his relatives to be considered for placement, he should have made that request much earlier in the proceedings. The court also noted that there was no indication in the record that a paternity test for Alonzo previously had been ordered. The court observed that Alonzo had waived his appearance at the May 15, 2012 hearing but had been represented by counsel at the hearing, and stated that it was not going to order a paternity test at such a late date. Proceeding with the section 366.26 hearing, the court denied Alonzo's request to set the matter for a contested hearing because he was an alleged father and did not make an offer of proof. The court found adoption to be the appropriate permanent plan for J.B. and terminated all parental rights over the child. On October 10, 2013, Alonzo filed a timely notice of appeal.

**DISCUSSION**

Alonzo argues that that his due process rights were violated because the juvenile court and the DCFS denied him the opportunity to elevate his paternity status by establishing that he was J.B.'s biological father. He specifically claims that the DCFS failed to provide him with proper notice of certain hearings, and failed to administer a paternity test previously ordered by the court. He also contends that these alleged errors were prejudicial because, if he had been able to establish his paternity, he would have been eligible for reunification services and consideration of a relative placement for J.B. We conclude that the juvenile court and the DCFS did not fully comply with the statutory requirements for notice to an alleged father and the procedure for determining paternity, but that such errors were harmless beyond a reasonable doubt.

**I.      Relevant Law**

"Dependency law recognizes three types of fathers: presumed, alleged and biological. [Citations.]" (*In re T.R.* (2005) 132 Cal.App.4th 1202, 1208-1209.) "An alleged father is a man who may be the father of the child but who has not established biological paternity or presumed father status. [Citation.] A biological father is one whose paternity of the child has been established, but who has not established that he qualifies as the child's presumed father. [Citation.] A presumed father is one who meets one or more specified criteria listed in [Family Code] section 7611. . . . [Citation.]" (*Id.* at p. 1209.) These statutory criteria include the man's marriage or attempted marriage to the mother, being named as the father on the birth certificate, or receiving the child into his home and openly holding the child out as his natural child. (Fam. Code, § 7611.)

"'A father's status is significant in dependency cases because it determines the extent to which the father may participate in the proceedings and the rights to which he is entitled. [Citation.] … Presumed father status entitles the father to appointed counsel, custody (absent a finding of detriment), and a reunification plan. [Citation.]' [Citation.] The court *may* provide reunification services to a biological father, if it determines that the provision of services will benefit the child. [Citation.] Due process for an alleged

9

father requires only that he be given notice and an opportunity to appear and assert a position and attempt to change his paternity status, in accordance with procedures set out in section 316.2. [Citation.] He is not entitled to appointed counsel or to reunification services. [Citation.]" (*In re Kobe A.* (2007) 146 Cal.App.4th 1113, 1120.)

Section 316.2 sets forth the statutory procedures that protect an alleged father's limited due process rights. Subdivision (a) of the statute requires the juvenile court to inquire as to the identity of all presumed or alleged fathers at the detention hearing or "as soon thereafter as practicable." (§ 316.2, subd. (a).) Subdivision (b) provides that "each alleged father shall be provided notice at his last and usual place of abode by certified mail return receipt requested alleging that he is or could be the father of the child. The notice shall state that the child is the subject of proceedings under Section 300 and that the proceedings could result in the termination of parental rights and adoption of the child. Judicial Council form Paternity-Waiver of Rights (JV-505) shall be included with the notice." (§ 316.2, subd. (b).) Form JV-505 "specifically informs an alleged father that he can compel the court to determine his paternity, and gives him the means to request appointment of counsel, [to] state his belief that he is the father of the child, and [to] ask that the court enter judgment of paternity." (*In re Kobe A.*, *supra*, 146 Cal.App.4th at p. 1121.)

California Rules of Court, rule 5.365 (rule 5.365), which implements the provisions of section 316.2, provides that the juvenile court "has a duty to inquire about and, if not otherwise determined, to attempt to determine the parentage of each child who is the subject of a petition filed under section 300. . . ." (Rule 5.365(a).) Subdivision (g) of the rule states that when an alleged parent of a child is identified, the clerk of the court generally "must provide to each named alleged parent, at the last known address, by certified mail, return receipt requested, a copy of the petition, notice of the next scheduled hearing, and Statement Regarding Parentage (Juvenile) (form JV-505)." (Rule 5.365(g).) Subdivision (h) of the rule states that when a person appears at a dependency hearing and requests a judgment of parentage on form JV-505, the juvenile court must determine "[w]hether that person is the biological parent of the child," and if requested,

10

"[w]hether that person is the presumed parent of the child." (Rule 5.365(h).) To determine parentage, the court "may order the child and any alleged parents to submit to genetic tests," or "may make its determination . . . based on the testimony, declarations, or statements of the alleged parents." (Rule 5.365(e).)

When a child is taken into protective custody and a section 300 petition is filed, the social worker must serve a notice of the initial hearing and a copy of the petition on certain identified parties, including alleged fathers, "as soon as possible after the filing of the petition." (§ 290.1, subd. (c).) Upon the filing of the petition, the clerk of the juvenile court also must serve a notice and copy of the petition on those "persons required to be noticed as soon as possible," and at least five days before the initial hearing if the child is detained. (§ 290.2, subd. (c).) Following the initial hearing on the petition, notice of the jurisdiction and/or disposition hearing must be served on certain enumerated parties, including "the father or fathers, presumed and alleged." (§ 291, subd. (a).) An alleged father is not entitled to notices of review hearings held pursuant to sections 366.21 and 366.22 unless he is receiving services, but he is entitled to notice of the section 366.26 selection and implementation hearing. (§§ 293, subd. (a); 294, subd. (a).)

"We typically apply a harmless-error analysis when a statutory mandate is disobeyed, except in a narrow category of circumstances when we deem the error reversible per se. This practice derives from article VI, section 13 of the California Constitution, which provides: 'No judgment shall be set aside, or new trial granted, in any cause … for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.'" (*In re Jesusa V.* (2004) 32 Cal.4th 588, 624; see also *In re James F.* (2008) 42 Cal.4th 901, 919 ["[i]f the outcome of a [dependency] proceeding has not been affected, denial of a right to notice and a hearing may be deemed harmless"].) Where an alleged parent is not provided with proper notice of the dependency proceedings or advised of the right to establish paternity, reversal is not required if the error is harmless beyond a reasonable doubt. (*In re Marcos G.* (2010) 182 Cal.App.4th 369, 387; *In re Kobe A.*, *supra*, 146 Cal.App.4th at p. 1122.)

11

## II.    No Reversible Error

Alonzo first argues that he was denied due process because he was not provided with proper notice of the dependency proceedings.  In particular, he asserts that the DCFS failed to serve him with notice of the status review hearings, the social worker's reports, and  Judicial Council form JV-505.  While we agree that there was a failure to follow certain statutory notice provisions in this case, the error was not prejudicial.

The record reflects that, after Alonzo was identified as an alleged father and his whereabouts were determined, he was served with Judicial Counsel form JV-450 for both the April 10, 2012 pretrial resolution conference and the May 15, 2012 jurisdiction and disposition hearing.  There is no indication in the record that Alonzo was ever served with a copy of the section 300 petition or with form JV-505, as required by section 316.2 and rule 5.635.  The forms that were served on Alonzo advised him of his right to attend the jurisdiction and disposition hearing and notified him that the hearing would be held under section 300 to determine whether J.B. should be declared a dependent of the court.  They also advised Alonzo of his right to have an attorney appointed to represent him at the hearing.  However, the forms did not provide Alonzo with notice of his right to seek a determination of paternity or the procedure for doing so.  The forms also did not advise Alonzo that the proceedings could result in the termination of his parental rights and the adoption of J.B.

Although there were defects in the initial notice provided to Alonzo as an alleged father, the error was harmless beyond a reasonable doubt.  In his April 2012 interview with the DCFS, Alonzo was advised by the case social worker of his right to paternity testing and specifically requested that a paternity test be ordered to determine if he was J.B.'s biological father.  The juvenile court granted the request at the May 15, 2012 jurisdiction and disposition hearing, and signed a written order for a paternity test for Alonzo that same day.  Alonzo waived his right to appear at both the pretrial resolution conference and the jurisdiction and disposition hearing.  However, at his request, Alonzo was appointed counsel to represent him, and his counsel attended the pretrial resolution conference, the jurisdiction and disposition hearing, and the six-month review hearing.

12

While Alonzo complains that he was not given notice of the six-month and 12-month review hearings, he was not entitled to notice of status review hearings as an alleged father who was not receiving services. (§ 293, subdivision (a)(2) ["notice of the review hearings held pursuant to Section 366.21 . . . shall be given to . . . [t]he presumed father or any father receiving services"].) The DCFS also reported that, at the time of the review hearings, Alonzo's whereabouts were unknown.[2] As an alleged father, Alonzo was entitled to notice of the section 366.26 hearing, and he does not dispute that he was given proper notice of that hearing and his right to attend. (§ 294, subd. (a)(2) ["notice of a selection and implementation hearing held pursuant to Section 366.26 . . . shall be given to . . . [t]he fathers, presumed or alleged"].) Alonzo made his first appearance in the case at the July 30, 2013 section 366.26 hearing, where his appointed counsel acknowledged that Alonzo had been aware of the proceedings for over a year. Thus, notwithstanding the defects in the initial notice, Alonzo had actual notice of his right to participate in the proceedings, to be appointed counsel to represent him, and to request a paternity test. In light of the fact that Alonzo exercised those rights, the error in notice was not prejudicial.

Alonzo also contends that his due process rights were violated because the juvenile court failed to enforce its prior order for a paternity test, which precluded Alonzo from elevating his paternity status from an alleged father to a biological father. Alonzo claims that the error mandates reversal because he would have been eligible to receive reunification services and to pursue a preferential relative placement for J.B. if he had

_____

[2]      Alonzo claims that the DCFS should have known where he was residing at the time of the December 2012 and April 2013 review hearings because he had advised the agency of his place of incarceration in April 2012. However, Alonzo also told the case social worker at that time that he was scheduled to be released from custody in October 2012. While the record is unclear as to whether Alonzo was in fact released, there is no indication that he attempted to maintain any contact with the DCFS following his initial interview. (*In re Raymond R.* (1994) 26 Cal.App.4th 436, 441 [social services agency "has a duty initially to make a good faith attempt to locate the parents of a dependent child," but "once a parent has been located, it becomes the obligation of the parent to communicate with the [agency]" and to "furnish a means of contact by mail"].)

13

been able to establish his paternity. We agree that the juvenile court erred when it found at the section 366.26 hearing that a paternity test had not previously been ordered for Alonzo. Although it was omitted from the May 15, 2012 minute order, it is undisputed that the court did sign a written order for a paternity test on that date. We conclude, however, that any failure by the juvenile court or the DCFS to ensure that the paternity test was completed prior to the termination of parental rights was harmless error.

Even if Alonzo had been able to establish that he was J.B.'s biological father, the outcome of the dependency proceedings would not have been any different. "'[O]nly a presumed, not a mere biological, father is a "'parent'" entitled to receive reunification services under section 361.5.' [Citation.] Thus, the courts have 'consistently held that a biological father's rights are limited to establishing his right to presumed father status, and the court does not err by terminating a biological father's parental rights when he has had the opportunity to show presumed father status and has not done so. [Citations.]' [Citation.]" (*In re T.G.* (2013) 215 Cal.App.4th 1, 5.) Alonzo does not argue that he met the statutory requirements for a presumed father, and the record does not contain any evidence to support a finding that he could have established presumed father status under Family Code section 7611. Alonzo was never married to Mother and did not attempt to marry her. He was not identified as J.B.'s father on the birth certificate. Although he reportedly held J.B. out as his son, he never received the child into his home or had any contact with him. Moreover, while the juvenile court has discretion to order reunification services for a biological father if doing so would benefit the child (§ 361.5, subd. (a)), there was no evidence that J.B. would have benefitted from such services. Alonzo was incarcerated shortly after Mother became pregnant and was not eligible for release until October 2012, which was shortly before the expiration of the initial reunification period. At the time of the section 366.26 hearing in July 2013, Alonzo was again incarcerated, and he still had not met J.B. or made any attempt to have contact with the child.

Alonzo asserts that, if he had been able to raise his paternity status from an alleged to a biological father, the juvenile court would have been required to consider placement of J.B. with his paternal relatives. This argument lacks merit. When Alonzo was initially

14

interviewed by the DCFS in April 2012, he was asked if he had any relatives with whom J.B. could be placed and stated that there were none. Alonzo did not request that his brother and sister-in-law be considered for a possible relative placement until the date of the continued section 366.26 hearing in October 2013. At that point, J.B. had been living in his prospective adoptive home for more than three months. He had adjusted well to the home, an approved adoptive home study had been completed, and the prospective adoptive parents were committed to providing J.B. with a stable and nurturing home. Regardless of whether Alonzo could change his paternity status, there was no obligation to place J.B. in a paternal relative's home, and the juvenile court reasonably could find that the belated request for a relative placement was not in the child's best interest.

The primary case relied on by Alonzo, *In re Paul H.* (2003) 111 Cal.App.4th 753, does not compel a different conclusion. In that case, the Court of Appeal held that the juvenile court's failure to comply with the statutory notice provisions for alleged fathers mandated reversal of an order terminating parental rights. As described by the appellate court, the alleged father made "extensive, if ineffective, efforts to obtain paternity testing on his own [which] were met with repeated roadblocks and, ultimately, were unsuccessful." (*Id*. at p. 761.) In concluding that the error was prejudicial, the Court of Appeal explained: "There was minimal information before the juvenile court regarding appellant's circumstances and background. It appears the social worker never interviewed appellant and provided no information to the juvenile court concerning his viability as a custodian for the minor. We cannot assume, based on this dearth of information, that had appellant established his paternity and been appointed counsel, he would not have received reunification services." (*Id*. at pp. 761-762.) In this case, however, there is sufficient information in the record about Alonzo's background and circumstances, his notice of the proceedings, and his lack of a relationship with J.B., to allow us to conclude that the procedural errors made by the juvenile court did not result in prejudice. Alonzo has failed to demonstrate any error in the juvenile court's orders requiring reversal.

## DISPOSITION

The juvenile court's orders terminating Alonzo's parental rights over J.B. and selecting adoption as the child's permanent plan are affirmed.


ZELON, J.


We concur:


PERLUSS, P. J.


WOODS, J.