Filed 1/7/15  In re J.C. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re J.C., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E061283 |
| Plaintiff and Respondent, | (Super.Ct.No. J242154) |
| v. | OPINION |
| M.S., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Christopher B. Marshall, Judge.  Affirmed.

Konrad S. Lee, under appointment by the Court of Appeal, for Defendant and Appellant.

Jean-Rene Basle, County Counsel, and Dawn M. Messer, Deputy County Counsel, for Plaintiff and Respondent.

1

Appellant M.S. (father) appeals from the juvenile court's order terminating his parental rights as to his son, J.C. (the child). Father argues that his due process rights were violated when the court terminated his parental rights without making the required detriment findings to establish his unfitness as a parent. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND[1]

On December 19, 2011, the San Bernardino County Department of Children and Family Services (CFS) filed a section 300 petition on behalf of the child, who was three years old at the time. The petition alleged that he came within section 300, subdivisions (b) (failure to protect), (c) (serious emotional damage), and (g) (no provision for support). The petition included the allegations that the child's mother (mother)[2] exposed the child and his half-brother, E.A.,[3] to domestic violence, mother was unable to provide care for the child since she passed away, the child was at substantial risk of suffering serious emotional damage as a result of being present at the beating of mother, and the alleged father (father) was incarcerated.

The social worker filed a detention report and stated that, on December 14, 2011, while the child and E.A. were in the room, mother, who was five months pregnant, was assaulted with a deadly weapon by her boyfriend. She had a miscarriage due to the injuries she sustained. Mother was transported to a hospital, where she was deemed to be

---

[1] On the court's own motion, we incorporated the record in case No. E055926, in the record of the instant case, No. E061283.

[2] Mother is deceased and is not a party to this appeal.

[3] E.A. is not a subject of this appeal. He has a different father.

in critical condition, brain dead, and not expected to survive. Mother's sister said she could not remember the name of the child's father, but knew he was in prison.

At a detention hearing on December 20, 2011, counsel for the child and E.A. informed the court that mother passed away. The court detained the child in foster care.

*Jurisdiction/disposition*

The social worker filed a jurisdiction/disposition report on January 6, 2012, recommending that the court declare the child a dependent and that father be denied reunification services, pursuant to section 361.5, subdivisions (b)(1). The social worker reported that the identity and whereabouts of father were still unknown. The social worker further reported that there was no knowledge of the child ever residing with his alleged father.

On January 30, 2012, father filed a Statement Regarding Parentage, stating his belief that he was the child's parent and requesting the court to enter a judgment of parentage. He stated that he had told "family" that the child was his, and that he had participated in activities with the child, such as a family reunion, and going to the park and beach. He also alleged that he had provided the child with clothes, shoes, games, and toys. He said the reason he was not on the child's birth certificate was that he was incarcerated. He stated his desire for his mother to have custody until his release.

A jurisdiction/disposition hearing was held on February 27, 2012. Counsel was appointed for father, who was not present since he was in state custody. County counsel informed the court that father's mother lived in Michigan, and she had called CFS to say that she wanted the child placed with her. CFS intended to initiate an Interstate Compact

3

for Placement of Children (ICPC). Father's counsel requested a paternity test to facilitate the ICPC. The court ordered CFS to get the paternity test done and then start the ICPC. The hearing was continued to March 26, 2012.

At the hearing on March 26, 2012, county counsel informed the court that the paternity testing had not yet been completed. CFS's position was that the court find father to be an alleged father, and that if he was found to be the biological father, it would open up the assessment for an ICPC to his mother. County counsel stated that father was not on the birth certificate, and he had no relationship with the child. The court found that father was an alleged father, who was not entitled to services at that time. The court declared the child a dependent of the court and placed him in CFS's custody. The court ordered no visitation, but noted that if father was determined to be the biological father, the social worker could facilitate visitation when he got out of custody. The court set the 366.26 hearing for July 24, 2012.

*Section 366.26*

On June 8, 2012, the court found father to be the biological father of the child. The genetic test reported that the probability of paternity was 99.98 percent.

The social worker subsequently filed a section 366.26 report on July 16, 2012, and recommended that the child be found to not be adoptable because of his extraordinary special needs, due to him witnessing his mother essentially be murdered. As a result, his emotional state and mental status were fragile and he exhibited problematic behavior. The social worker recommended that the plan of a Planned Permanent Living Arrangement be pursued. The child was placed in his current placement on December

4

14, 2011, and was doing well considering his traumatic history. The caretaker was very supportive and said she may be willing to commit to legal guardianship. Father was still in prison and had not had any contact with the child. Father's mother (the paternal grandmother) requested placement. She said that mother lived with her and father when mother was pregnant with the child and for a few months after he was born. The social worker reported that an ICPC was submitted for her. The paternal grandmother was having monthly telephone contact with the child, although the child did not seem to remember who she was. The social worker opined that it was in the child's best interest to remain in his stable placement, where he could continue to receive treatment for his trauma and continue to have contact with his brother, E.A.

A section 366.26 hearing was held on July 24, 2012, and father was present in custody. County counsel informed the court that the proposed plan was that the child remain with the foster parent in a permanent living arrangement, with the goal of guardianship. The child's counsel agreed with the recommendation. Father's counsel also submitted on the recommendation and added that an ICPC was submitted for the paternal grandmother. The court continued the child as a dependent of the court and ordered the plan of permanent placement with the foster parent, with the goal of legal guardianship. The court continued the matter to January 18, 2013, for a permanency planning review.

*Status Reviews*

The social worker filed a status review report on January 16, 2013, and opined that the current planned living arrangement continued to be appropriate.

At the hearing on January 18, 2013, the court continued the child as a dependent of the court and found that the current plan remained appropriate. The matter was continued to July 12, 2013.

The social worker filed another status review report on July 3, 2013, and reported that father was incarcerated in state prison on a felony conviction of possession of a firearm, with an unknown date of release. The social worker recommended that the court find the permanent plan needed to be modified to adoption, and that it was in the child's best interest to consider termination of parental rights at a section 366.26 hearing.

The court held a review hearing on July 15, 2013. County counsel requested the court to set a section 366.26 hearing. The court adopted the social worker's findings and set a section 366.26 hearing for November 12, 2013, to determine the most appropriate plan for the child.

*Section 366.26*

The social worker filed a section 366.26 hearing on November 7, 2013, and recommended that the court continue the hearing for 180 days to allow more time to facilitate the child's transition into his prospective adoptive home. The social worker reported that the child was appropriate to be adopted, and that she was assessing relatives and non-extended family members that had come forward to determine if they were appropriate for adoptive placement.

At the hearing on November 12, 2013, the court continued the matter to May 12, 2014.

The social worker filed an addendum report on May 5, 2014, and recommended that the court terminate parental rights and order adoption as the permanent plan. The social worker reported that the paternal grandmother had been under assessment through ICPC, but had not been approved yet. The maternal aunt was also interested in adopting the child, although the social worker opined that she was not in a position to care for him. The current foster mother and her adult granddaughter had provided consistent care for the child since his placement in their home on December 15, 2011. The adult granddaughter was in the process of moving into a new home, and she wanted to be assessed for adoption of the child. Thus, the social worker recommended that the child be freed for adoption, in order to be placed with the foster mother's granddaughter or an alternative prospective adoptive parent, if she was not approved.

At the May 12, 2014 hearing, the matter was continued until June 4, 2014.

At the hearing on June 4, 2012, father was present in custody. County counsel stated that the child was in a concurrent home. The paternal grandmother was present and still wished to have the child placed with her. The court explained that the child had been in the concurrent planning home for three years, and that it was not in the child's best interest to move him. Father objected to the termination of his parental rights, but produced no affirmative evidence. The child's counsel agreed with the social worker's recommendation. The court found it likely that the child would be adopted, terminated parental rights, and ordered adoption as the permanent plan.

ANALYSIS

The Court Properly Terminated Father's Parental Rights

Father's sole issue on appeal is that the juvenile court erred in terminating his parental rights without making a finding of detriment or parental unfitness. We find no error since father was never found to be a presumed father.

"The Uniform Parentage Act [citation] provides the statutory framework by which California courts make paternity determinations. [Citations.] Under this statutory scheme, California law distinguishes 'alleged,' 'biological,' and 'presumed' fathers. [Citation.] 'A man who may be the father of a child, but whose biological paternity has not been established, or, in the alternative, has not achieved presumed father status, is an "alleged" father. [Citation.]' [Citation.] 'A biological or natural father is one whose biological paternity has been established, but who has not achieved presumed father status . . . .' [Citation.] [¶] 'Presumed' fathers are accorded far greater parental rights than alleged or biological fathers. [Citation.] . . . Biological fatherhood does not, in and of itself, qualify a man for presumed father status under section 7611. On the contrary, presumed father status is based on the familial relationship between the man and child, rather than any biological connection. [Citation.]" (*In re J.L.* (2008) 159 Cal.App.4th 1010, 1018.) "Presumed fatherhood, for purposes of dependency proceedings, denotes one who 'promptly comes forward and demonstrates a full commitment to his paternal responsibilities—emotional, financial, and otherwise[.]'" (*In re Jerry P.* (2002) 95 Cal.App.4th 793, 801-802, fn. omitted.) "This court has consistently held that a biological father's rights are limited to establishing his right to presumed father status,

8

and the court does not err by terminating a biological father's parental rights when he has had the opportunity to show presumed father status and has not done so. [Citations.]" (*In re A.S.* (2009) 180 Cal.App.4th 351, 362; see also *In re Ninfa S.* (1998) 62 Cal.App.4th 808, 811.)

Here, father was initially found to be an alleged father. Subsequently, the court found him to be the biological father of the child, based on the results of a genetic test. Father has never been elevated to presumed father status. On appeal, he does not dispute that the court never made an express finding that he was the child's presumed father. He also does not claim he was denied the opportunity to show his entitlement to presumed father status. Since father was merely a biological father, the court was not required to make a finding that he was unfit before terminating his parental rights. (*In re Jason J.* (2009) 175 Cal.App.4th 922, 933-934.)

Father spends a substantial amount of time discussing four cases, including *In re Gladys L.* (2006) 141 Cal.App.4th 845 (*Gladys L.*), *In re Frank R.* (2011) 192 Cal.App.4th 532 (*Frank R.*), *In re Z.K.* (2011) 201 Cal.App.4th 51 (*Z.K.*), and *In re T.G.* (2013) 215 Cal.App.4th 1 (*T.G.*). However, none of these cases pertain to the rights of mere biological fathers. As the court in *T.G.* explained, "*Gladys L.*, *Frank R.*, and *Z.K.* teach that a court may not terminate a nonoffending, noncustodial mother's or presumed father's parental rights without finding, by clear and convincing evidence, that awarding custody to the parent would be detrimental." (*T.G.*, *supra*, 215 Cal.App.4th at p. 20.) Furthermore, the father in *T.G.* was declared a presumed father, and he repeatedly sought

9

custody. (*Id*. at p. 18.) In the instant case, father was never declared a presumed father, and he never sought custody of the child.

Father claims that a finding that he is a presumed father can be implied from the record "because of the way the court and the parties behaved." He cites as evidence his declaration of parentage, the fact that the court authorized the ICPC request for the paternal grandmother to be a possible placement for the child, and the paternal grandmother's statement that the child, father, and mother lived with her for over a year after the child was born. Father concludes that "the fact that the juvenile court made no specific finding elevating [him] to presumed father status is, therefore, immaterial." None of the cases cited by father concern the issue of whether presumed father status can be implied from the record. "Where a point is merely asserted by appellant's counsel without any argument of or authority for the proposition, it is deemed to be without foundation and requires no discussion by the reviewing court. [Citation.]" (*Atchley v. City of Fresno* (1984) 151 Cal.App.3d 635, 647.)

Finally, in his reply brief, father makes the nonsensical argument that CFS has "forfeited any claim [he] is not a presumed father by treating him as such in the court below and by failing to object to his participation in the proceeding beyond the scope allowed for merely an alleged father." We first note that father's status was that of a biological father, not "merely an alleged father." Moreover, CFS is not making the claim that father is not a presumed father, but is only responding to his argument on appeal. In any event, it is undisputed that the court never declared father to be a presumed father.

## DISPOSITION

The order is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

HOLLENHORST

J.

We concur:

RAMIREZ

P. J.

KING

J.

11