Filed 7/15/16  In re J.L. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re J.L. et al., Persons Coming Under the Juvenile Court Law. | |
| ALAMEDA COUNTY SOCIAL SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>J.L.,<br><br>        Defendant and Appellant. | A147211<br><br>(Alameda County<br>Super. Ct. Nos. OJ13021089,<br>OJ13021090) |

The twin daughters of appellant J.L. (Father) were taken from the custody of their mother (Mother) in June 2013.  Although Mother suffered from substance abuse and mental illness, Father had left the children in Mother's care a year earlier when he was charged with abusing Mother.  After the dependency proceeding was commenced, Father delayed becoming involved for several months.  In part as a result of these delays, he was denied reunification services.  Later, at a hearing conducted pursuant to Welfare and Institutions Code section 366.26,[1] the juvenile court found that return of the children to Father would be detrimental to their emotional well-being and terminated Father's parental rights.  We affirm.

---

[1] All statutory references are to the Welfare and Institutions Code.

## I. BACKGROUND

In June 2013, the Alameda County Social Services Agency (Agency) filed dependency petitions in connection with E.L. and J.L. (twins), the two-year-old twin daughters of Father and Mother. The petitions alleged Mother was no longer willing and able to care for the twins as a result of financial difficulties, due in part to her substance abuse. (§ 300, subd. (g).) Mother was also alleged to suffer from poorly treated bipolar disorder.

As detailed in our prior opinion in this matter, *In re J.L.* (Nov. 10, 2015, A144486) [nonpub. opn.] (*J.L. I*)), the twins had lived in Father's home for the first 18 months of their lives. Mother left with them in May 2012, after Father was arrested on a charge of domestic violence against her, and they had no further contact with him until after commencement of these proceedings. Father learned of the proceedings in July 2013, but he did not seek visitation with the twins until December.[2] Father's status was elevated to presumed father in March 2014, just one week before the juvenile court terminated Mother's reunification services and scheduled a section 366.26 permanency planning hearing. Although Father's attorney made an unsuccessful oral motion for reunification services at that time, it was not until late June 2014 that a proper written section 388 petition for modification granting Father reunification services was filed. By that time, Father had completed only four visits with the twins. In the meantime, the twins had developed a strong relationship with their foster parent, Mother's sister, with whom they had been placed in September 2013. Father continued to have twice-monthly visits thereafter, but he had little contact with the twins outside of the visits. In January 2015, the trial court denied Father's section 388 petition, concluding the twins' interests would be better served by a permanent placement with their aunt, who was willing to adopt them, than the possibility of reunification with Father. We affirmed that decision.

The section 366.26 hearing, scheduled to begin the month following denial of the section 388 petition, did not conclude until November 2015. In reports filed in

---

[2] As a result of Agency delays, the visits did not actually begin until May 2014.

connection with the hearing, the Agency recommended termination of the parents' parental rights and adoption by the aunt. The twins were, by that time, over four years old and had not lived with Father for nearly three years. They were thriving in the home of their aunt, whom they referred to as their mother. Through June 2015, Father continued to have regular visits with the twins, but he had little other contact, despite the aunt's willingness to permit telephone calls. The twins were comfortable with Father and enjoyed their visits, but he played little, if any, other role in their lives.

During the hearing, Father testified that he had no contact with the twins from May 2012 until visitation began in this proceeding because he was subject to a domestic violence restraining order. In the fight that led to entry of the restraining order, he claimed to have merely responded to violence by Mother, who was "frequently" violent. In connection with the subsequent domestic violence charge, Father attended a domestic violence course. Although Father had been concerned about leaving the twins with Mother, who was mentally unstable and a substance abuser, he made no attempt to check on their well-being or assist Mother in obtaining drug treatment after the restraining order was entered. Father acknowledged a 2008 or 2009 conviction for possession for sale of cocaine and said he completed his probation several years ago. Father did not attend any drug treatment programs in connection with the conviction.

The responsible social worker also testified. She said the Agency recommended adoption as the permanent plan because the twins had successfully accepted their aunt as a parent and were "very much connected" to her. In her care, they had overcome the anxiety they displayed at the time of their detention. The social worker was concerned Father's domestic violence was more severe than he acknowledged. Having reviewed the police report and spoken to Mother about the incident, the social worker testified that Father attempted to choke Mother in the presence of the twins, leaving bruises. Further, she had examined the restraining order entered against Father and noted it allowed him to visit with the twins. According to the social worker, the twins did not view Father as a parent or caregiver because he was absent from their life for nearly two years, had only

3

semi-monthly visits with them after that, and had little contact with them outside the visits.

The juvenile court adopted the Agency's recommendation and terminated Father's parental rights, finding by clear and convincing evidence that placement of the twins with him would be detrimental. Explaining its finding, the court noted Father's apparent lack of interest in the twins' well-being after the restraining order was entered, his present lack of contact with them outside of scheduled visits, his history of domestic violence and drug abuse, and the lack of a strong emotional bond between Father and the twins, particularly when compared to the bond between the twins and their aunt. As the court said, Father "has not demonstrated during these proceedings a strong interest or priority in assuming a parental role in the children's lives and he does not occupy that role now despite visitation."

## II. DISCUSSION

Father contends the order terminating his parental rights must be reversed because the juvenile court's finding that placement of the twins with Father would be detrimental is not supported by substantial evidence.

Before a parent can be deprived of his or her constitutional right in the care and custody of a child, a court must find by clear and convincing evidence that the parent is unqualified. (*Santosky v. Kramer* (1982) 455 U.S. 745, 747–748.) That determination ordinarily occurs at the dispositional stage in a California dependency proceeding, which requires a finding by clear and convincing evidence that "placement with [the] parent would be detrimental to the safety, protection, or physical or emotional well-being of the child" before a parent can be denied custody of his or her child. (§ 361.2, subd. (a); *In re Liam L.* (2015) 240 Cal.App.4th 1068, 1081.) If that finding is made at the time of the dispositional hearing, no further finding of detriment is necessary prior to the termination of the parent's parental rights in the child. (*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 253–254.) If no finding of detriment is made with respect to a particular parent at the dispositional stage, however, that parent's parental rights cannot be terminated at a later stage in the proceedings unless the juvenile court, at that time, makes

4

a section 361.2 finding of detriment on the basis of clear and convincing evidence. (*In re T.G.* (2013) 215 Cal.App.4th 1, 20.)

"In general, under the detriment standard, it is not the nonoffending parent's burden to show that she is capable of caring for her child. Instead, the party who is opposing placement has the burden to show by clear and convincing evidence that the child will be harmed if the nonoffending parent is given custody." (*In re Jonathan P.* (2014) 226 Cal.App.4th 1240, 1256.) "A detriment evaluation requires that the court weigh all relevant factors to determine if the child will suffer net harm." (*In re Luke M.* (2003) 107 Cal.App.4th 1412, 1425.) In doing so, the court has "broad discretion to evaluate not only the child's physical safety but also his or her emotional well-being. In an appropriate case, all that might be required is a finding such a placement would impair the emotional security of the child." (*In re C.C.* (2009) 172 Cal.App.4th 1481, 1490.) The detriment standard, while "vaguely worded to be sure, must be construed as a fairly high one." (*David B. v. Superior Court* (2004) 123 Cal.App.4th 768, 789; see *In re Patrick S.* (2013) 218 Cal.App.4th 1254, 1263 (*Patrick S.*) ["When the parent is competent, the standard of detriment is very high."].)

"We review the record in the light most favorable to the court's order to determine whether there is substantial evidence from which a reasonable trier of fact could find clear and convincing evidence that placement would be detrimental to the child. Clear and convincing evidence requires a high probability, such that the evidence is so clear as to leave no substantial doubt." (*Patrick S., supra*, 218 Cal.App.4th at p. 1262.)

As we discussed in *J.L. I*, once reunification services have been terminated, the state's interest requires the court to focus its efforts on the child's placement and well-being, rather than on the parent's interest in regaining custody. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 307.) When a parent appears in his or her child's dependency proceedings for the first time after attempts to reunify the child with the other parent have been unsuccessful, that parent's untimely appearance does not alter the statutory context of the section 366.26 hearing, which is focused on the child's interest in permanency and stability. (*Marilyn H.*, at p. 309; *In re A.S.* (2009) 180 Cal.App.4th 351, 361 [court may

terminate the parental rights of a previously noncustodial parent without having made a dispositional finding that he or she is an unfit parent].)

We find substantial evidence to support a finding of emotional detriment in these circumstances. By the time the section 366.26 hearing was concluded, the twins had been living with their aunt for nearly half their young lives, and they had come to accept her as their parent. The stability they found in her home helped them overcome the anxiety created by their chaotic life with Mother. In contrast, their time with Father since he left them with Mother three years earlier had been fairly limited, and they did not see him in a parental role. As the juvenile court noted, their removal from their aunt's home in favor of custody with Father would have been seriously emotionally disturbing, at a minimum.

There were also, as the juvenile court noted, reasons for doubting Father's competence in parenting the twins. Father was well aware of Mother's violence and emotional instability, yet he essentially abandoned the twins to Mother's care when they were 18 months old. Although the terms of his restraining order permitted him contact with the twins, he neither saw them nor spoke to them for nearly two years. Once they were removed from Mother's custody, Father still made little attempt to assert his parental rights or even become involved in their lives. He was notified by the Agency of the dependency proceedings in July 2013, but he did not even seek visitation with the twins until December. It was January 2014 before he expressed an interest in custody, and he did not become formally involved in the dependency proceedings until March, when he was declared a presumed father. Since then, while he has visited with the twins twice a month, he has made little additional effort to establish a bond with them. In other words, Father's attitude toward assuming parental responsibility for his children has been, at best, ambivalent, providing the court with no assurance he would be a reliable parent. Compounding this was the serious nature of the incident of domestic violence against Mother, which Father minimized rather than acknowledging frankly.

Father contends it was improper for the court to consider "what it perceived to be delays in [Father] coming forward to assert rights, his limited visitation with his

daughters, and the length of time [the twins] had been in placement" because, while Father "did contribute to some limited delays," the delays were primarily due to the Agency. The argument badly mischaracterizes the record. The most troubling aspect of Father's history was his decision to leave the twins in Mother's care, knowing her to be violent and unstable. The Agency had no responsibility for that decision. Once the dependency proceeding began, the Agency promptly notified Father by telephone of the proceeding, but he delayed substantive involvement for months. While it is true the Agency failed to provide Father proper written notice, Father's participation was not dependent upon such notice. The Agency was responsible for a four-month delay in commencing visitation, but that is the extent of the Agency's fault. It is simply not true, as Father argues, that he "could not have done much more any sooner." We find no error in the juvenile court's consideration of Father's past conduct with respect to the twins in evaluating detriment.

Father also contends the juvenile court should not have considered the incident of domestic violence because it occurred three years prior to the section 366.26 hearing and he had attended a domestic violence program. We do not agree that Father's domestic violence was rendered irrelevant by the passage of three years. As the social worker noted, it was a seriously violent incident committed in the presence of the twins. Further, while Father's program attendance might mitigate to some degree the concern, his testimony at the hearing, in which he minimized the degree of violence and effectively blamed the incident on Mother, demonstrates that the lessons presumably taught in the program were not fully absorbed. In any event, we do not understand the juvenile court to have placed decisive importance on the incident of domestic violence in finding detriment. For the reasons discussed above, the twins' well-established bond with their aunt, the lack of a comparable bond with Father, Father's past failure to protect the twins, and his current failure to pursue stronger bonds with them constitute substantial evidence of detriment if the twins were placed with Father.

### III. DISPOSITION

The orders of the trial court are affirmed.

_____
Margulies, Acting P.J.

We concur:


_____
Dondero, J.


_____
Banke, J.