Filed 10/31/25  In re Evelynn J. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re EVELYNN J. et al., Persons Coming Under Juvenile Court Law. | B344746 (Los Angeles County Super. Ct. No. 23CMJP00013) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff,<br><br>v.<br><br>ERICA E.,<br><br>Defendant and Appellant;<br><br>PHILLIP J., SR.,<br><br>Respondent. | |

APPEAL from an order of the Superior Court of Los Angeles County, Ashley Price, Judge. Affirmed.

Anuradha Khemka, under appointment by the Court of Appeal, for Defendant and Appellant.

Janette Freeman Cochran, under appointment by the Court of Appeal, for Respondent.

_____

In February 2025, after the Los Angeles Department of Children and Family Services (DCFS) filed a petition under Welfare and Institutions Code section 300 on behalf of all of appellant mother Erica E.'s children, the juvenile court granted a request for a restraining order brought under section 213.5 by respondent Phillip J., Sr., the father of four of Mother's children.[1] The restraining order required Mother to move out of the home that she and those children—but not Father—had been living in for the past several years. Mother's sole contention on appeal is that the court erroneously ordered her to move out because Father failed to demonstrate he had a right to possession of the home under color of law. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    *The Family*

Mother has six children: Evelynn J. (born August 2012); Evan J. (born April 2014); Phillip J., Jr. (born February 2015); Ki.M. (born June 2019); Ko.M. (born May 2020); and Bobbie J.

_____

[1] Undesignated statutory references are to the Welfare and Institutions Code.

(born January 2022).  Phillip J., Sr., is the father of Evelynn, Evan, Phillip Jr., and Ki.M.  Robert M. is the father of Ko.M., and Roberto J. is the father of Bobbie.  This appeal concerns only Phillip J., Sr., and his and Mother's mutual children.

### B.    *Prior Child Welfare History*

In June 2015, the court sustained a petition under section 300, subdivision (b)(1), as to Evelynn, Evan, and Phillip Jr., which alleged that Mother had an unresolved history of illicit drug use, that Phillip Jr. had been born with a positive toxicology screen for methamphetamine, and that Mother and Phillip Sr. had a history of unresolved domestic disputes in the children's presence.  In October 2015, the court placed Evan and Phillip Jr. with Mother under DCFS supervision.  In December 2015, the court placed Evelynn with Mother, again under DCFS supervision.

In May 2016, DCFS filed a section 387 petition "due to the mother's relapse."  Mother entered a residential treatment program.  In July 2016, the court returned the children to Mother under DCFS supervision, on the condition that Mother remained in her treatment program.  In February 2017, the court ordered both Mother and Father to "stay away from each other's home, place of employment or school, and place of worship."

In May 2017, DCFS filed a section 387 petition "due to the mother's relapse and violation of the court Stay Away Order"; the children were placed in foster care.  In August 2017, the court sustained the petition, which alleged that Mother had a history of substance abuse and was "a current abuser of methamphetamine and marijuana," and that in May 2017, Mother had tested positive for methamphetamine and marijuana while the children were in her care.

3

In September 2018, the court released Evelynn and Evan to Mother. In April 2019, the court released Phillip Jr. to her. The court terminated jurisdiction in July 2019.

In December 2023, DCFS filed a petition alleging, among other counts, that Mother endangered her children due to her mental and emotional problems and her paranoid behavior. In May 2024, the court sustained this count but ordered the children to be released to their respective parents (including Mother). In October 2024, the court entered juvenile custody orders granting joint legal and physical custody of the children to their respective parents and terminated jurisdiction. Mother appealed the court's finding of jurisdiction and the "Final custody and termination orders," and we affirmed. (*In re Evelynn J.* (Mar. 21, 2025, B338274) [nonpub. opn.].)

### C.    *DCFS Investigates a Referral*

On the night of December 28, 2024, DCFS received a referral alleging Mother physically abused and neglected Evelynn, Evan, Phillip Jr., and Ki.M. A children's social worker (CSW) responded the next day.

A sheriff's deputy informed the CSW that the Sheriff's Department received multiple calls from Evelynn on December 28, reporting that Mother "punched her in the face, struck the child multiple times on the head with a metal belt buckle, bit the child's calf, and pushed the child against the closet." Law enforcement observed Evelynn with visible bruises on her face, arm, and calf, and a bump on her forehead. Evan had bruises on both arms. Phillip Jr. had a bruise on his face and bumps on his head. And Ki.M. had scratches on his calf. Evelynn reported Mother wrestled her to the ground to get a cellphone Evelynn used to call 911, causing Evelynn to fall and hit her head; Mother

4

then bit her in the calf. Phillip Jr. reported Mother punched his face with a closed fist and hit him on the head multiple times with a belt buckle. Mother was arrested and charged with "willingly inflicted injury to child [*sic*], assault with a deadly weapon other than a firearm, and mayhem." The sheriff's department released the children to Father.

DCFS implemented a "Safety Plan" with Father in which he would stay with the children at their home. Father was "aware that he could no longer remain at the mother's residence if the mother is released from custody." But DCFS also told Father that "if the mother is-released from custody, the mother could not remain in the home with the children"; Father received "resources and linkages regarding where to take the children if the mother is released from custody."[2]

The CSW interviewed Mother, who claimed she called 911 because Evan "broke windows in the home, . . . [called] the mother names, and . . . looked at the mother while saying, 'Watch how shit bitch, and watch how you go to jail [*sic*].' " Mother denied hitting any of her children. The CSW informed Mother "the children were safe and . . . released to the father" and "the children and their father are at her home." Mother "informed [the] CSW that she gives permission for the father to be at the home with the children during her absence." Later, Mother "gave verbal consent for the children Evelynn, Evan, Phillip, and Ki[.M.] to be detained by DCFS, and for the children to be cared for by their father. The mother stated the father could stay at her home to benefit the children." When the CSW informed her

_____

[2] Father had been "trying to get on his feet financially, but it has been a struggle." He reported sleeping "on the couch at his sister's home."

that, "if she is released from custody, she could not reside in the home with the children, even if the father is in the home," Mother "agreed, and she stated that she wants to co-parent with the father as long as he understands that they are not in a relationship."

The CSW also spoke with the children. Evelynn informed the CSW Mother "becomes angry almost daily and she hits all of the children several times per week." Both Evan and Phillip Jr. confirmed Mother hit the children constantly, and all three children affirmed they felt safe with Father.[3]

## D. *The Court Removes the Children and Grants a Restraining Order*

### 1. The Court Removes the Children From Mother

A few days after DCFS investigated the referral, it filed a petition on behalf of all Mother's children under section 300, subdivisions (a), (b)(1), and (j), alleging Mother physically abused Evelynn, Evan, Phillip Jr., and Ki.M. The petition also alleged Mother suffered from "mental and emotional problems, paranoia, auditory hallucinations, and homicidal ideations" and "has a history of substance abuse and is a current abuser of methamphetamine and marijuana."

---

[3] The CSW was unable to have an intelligible conversation with Ki.M. due to him "being on the Autistic Spectrum, and he demonstrates with low to moderate functioning." However, a nurse practitioner reported Mother would "plug" Ki,M.'s nose with her fingers, causing him to "freak[] out" due to being unable to breathe. She would also grab the inside of his mouth "to make him come closer."

At the detention hearing, the court found a prima facie case for detaining the children and released them to their respective fathers. At the request of the children's counsel, the court ordered Mother to have no visitation with Evelynn and Evan, and monitored weekly visitation with the other children.

In a February 2025 Jurisdiction and Disposition report, the children confirmed to a dependency investigator the allegations of Mother's physical abuse toward them; the report contained no new statements from Mother because she had "not made herself available to" DCFS. The report noted the children were comfortable in Father's care, and he appeared "caring and affectionate with his children."

At the February 2025 adjudication and disposition hearing, the court found the petition's allegations against Mother to be true. As to Evelynn, Evan, Phillip Jr., and Ki.M., the court found it would be detrimental for Mother to visit. The court terminated jurisdiction as to Ko.M. and Bobbie, awarding sole legal and physical custody to their respective fathers.

### 2. The Court Grants a Restraining Order

#### (a) Father Requests a Restraining Order

The day of the detention hearing, Father requested a restraining order against Mother on behalf of himself and his children. He alleged that after Mother was arrested, DCFS released the children into his care in the home Mother had been living in with the children; he had lived there for half a month. DCFS developed a safety plan forbidding Mother to live in the same home as the children or to have unmonitored contact. When Mother was in police custody, she agreed to enter treatment once released, but subsequently reneged after being

released.  Instead, she "came to the family home each day in violation of the safety plan," "attempted to break into the home, demanded to be allowed into the home, and threatened to call the police and have [Father] arrested in order to gain access to the home."  Father asked the court to order Mother to stay 100 yards away from him and their children, move out of her home, have no visits with Evelynn and Evan, and have monitored visits with Phillip Jr. and Ki.M.

### (b) The Court Grants a Temporary Restraining Order

At the initial restraining order hearing—heard simultaneously with the detention hearing—Father's counsel argued the court could order Mother to move out of the home if, among other things, Father demonstrated he had a right to possession of the home under color of law.  He continued that a person gained such a right "when he lives there with the child who is part of the dependency case and lived in the property for some length of time and/or pays some or all of the rent or mortgage."  Counsel further pointed out Mother had agreed the children would be in Father's custody and that she could not live with the children once released from police custody.  Counsel represented to the court that Father was "working diligently to obtain housing for himself and the children" but it had so far proven "difficult in the extreme."  Counsel stated the "sole purpose" of seeking a "move-out" order for Mother was to keep the children "safe and housed."  Counsel added that even if it was an "open question" whether Father had a right under color of law to reside in the home, it was "much clearer that the children" did, having lived there for at least several years.  The children's counsel joined in these arguments, adding that, based on her

8

conversation with the landlord, at least one of the children was on the lease to the home.

Mother's counsel countered Father had been living at Mother's home for only a few weeks and was unable to pay toward rent or utilities; counsel contended Father failed to show he had a right to possession under color of law.

The court granted a temporary restraining order and required Mother to move out of the home, citing counsel's representation that at least one child was on the lease, and the evidence that Mother had given Father permission to be in the home without contrary evidence that such permission had been revoked. The court found this sufficient to temporarily order Mother to move out, while permitting the parties to further brief and argue the issue at the permanent restraining order hearing.

### (c)    The Parties Brief the Issue

Mother's counsel filed a brief arguing Father had failed to demonstrate his right to possession of the home under color of law, pointing to the absence of evidence that Father "contributed any money to maintaining the house by, for example, paying part of the rent or any portion of the utilities in the home," that Father "previously resided in the home for a substantial period of time immediately prior to the request for a move-out order," or that Mother intended Father "to be a permanent member of the home," as her authorization for his presence was only " 'during her absence.' " Mother's counsel acknowledged the "difficult circumstance of the children having to reside with [Father] at some sort of shelter" but asserted "[t]his outcome similarly does not provide [Father] with a right under the color of law to possess" the home.

Father's counsel countered Father had a right to possession under color of law because "he began occupying the property with [Mother]'s consent and the Department's approval, and he has resided in the home with the four children who are under his care. Additionally, even before he moved into the . . . property, [Father] received mail there and paid for cable and Internet service in the home."[4] Father's counsel pointed out that the Judicial Council form used to request a restraining order "suggest[s] that 'owning the home,' being named on the lease, or 'pay[ing] for some or all [of] the rent or mortgage,' are sufficient to establish 'a right to live' at a property," as well as other factors, "including living in the property with children and having lived in the property for some period of time." Father's counsel added that even if Father did not have the right to possession, the children did because they had lived in the home for over a year and "at least one of the children is named on the lease." Finally, Father's counsel contended "possession" of a property did not equate to "legal or equitable title," and reiterated Father sought only possession.

### (d) The Court Holds an Initial Hearing

In February 2025, the court held an initial hearing for the permanent restraining order, where it admitted into evidence screenshots provided by Father showing that: (1) Father's e-mail

_____

[4] Father included, as exhibits: (1) a December 28, 2024 letter from Spectrum addressed to him at the home; and (2) screenshots from a mobile phone (presumably Father's) showing payments to Spectrum on December 27, 2024, and January 17, 2025, and a Spectrum page listing Father's e-mail address and the home's physical address.

address was associated with the Southern California Gas Company account servicing the home, and the password for the account had been changed; (2) a "Weekly Bill Tracker Alert" from Southern California Gas Company regarding the home; (3) a mid-January 2025 payment made to Southern California Edison; and (4) a mid-January 2025 payment made to Spectrum.

Father's counsel argued Father had a right to possession of the home under color of law because he "lived there for sometime [*sic*] . . . with the children," and because "he paid some expenses and is willing to pay even more of the expenses th[a]n he already has." Counsel added that even if Father lacked the right to possession, the children had that right because they had lived in the home for several years. Counsel also pointed out that section 300 of the Welfare and Institutions Code explicitly stated it was the Legislature's intent to not disrupt the family unnecessarily or inappropriately, and that Father remaining in the home was "the best and most straightforward path to prevent unnecessary disruption in the children's lives." Finally, counsel noted that, should the court deny the request for a "move-out" order, Father and the children would be required to leave the home and, despite efforts to find them another place to live, they had nowhere to go—to the extent DCFS could help Father and the children find temporary housing, the same assistance could be more easily offered to Mother, as it would be easier to house one adult compared to one adult and four children.

The children's counsel joined the arguments made by Father's counsel, reiterating she had spoken with the landlord, who "confirmed that it is his belief that Evelynn is listed on the lease."

11

Mother's counsel asserted Mother had only intended to permit Father to use the home while she was incarcerated. He argued Father receiving mail at the home did not indicate he had a right to possession of the home, and there was no evidence Father paid any bills for the home before he recently moved in. Counsel "concede[d] the children themselves have a possessory right," but argued such right did not "transfer" to Father. Counsel asked the court to order DCFS to provide Father and the children "with housing particularly at a place or location like a hotel," as DCFS was "under the already existing legal duty . . . to provide reasonable efforts to maintain custody with" Father.

DCFS's counsel made no argument on whether Father had the right to possession under color of law, instead representing to the court that: (1) it wanted to see the children in a "safe[,] stable home" such as the one they currently lived in; and (2) DCFS could only make "housing referrals" but could not pay for hotels or provide housing vouchers.

The court concluded it needed to continue the hearing because Mother had not been properly served with the temporary restraining order but found that "there is a sufficient showing by [Father] that he does have a right to be in the home under color of law based on the fact that the children have a possessory right in the home, that he has custody of the children at the current time" and that the court was "mitigating having to disrupt the family and move these children to a temporary location." The court noted the restraining order request form indicated the court should also consider the children's interest and cited the "overarching aim of the dependency court to keep the children stabilized and safe when it is possible to do so." The court's minute order provided that Father "is currently responsible for

12

caring for the child[ren] . . . in their home at [address of Mother's home]."

### (e) The Court Grants a Permanent Restraining Order

At the continued hearing date, the court granted a one-year restraining order, finding that, "in the dependency context, the color of law argument does have some consideration for the children and their right to the property." The court also noted that, while Mother's counsel argued the court should not order Mother to move out, there was an "absence of evidence" of Mother revoking permission for Father to remain in the home, as Mother had refused to communicate with DCFS or appear at various hearings. The court found probative the fact that Mother "was warned that even after she was released, she could not return to the home if the children were there."

Mother timely appealed.

### DISCUSSION

"After a petition has been filed under section 300 . . . , and until the petition is dismissed or dependency . . . is terminated, . . . the court may issue restraining orders as provided in section 213.5. The juvenile court has exclusive jurisdiction under section 213.5 to issue a restraining order to protect the child who is the subject of a petition under section 300, or any other child in the household." (Cal. Rules of Court, rule 5.630(a)(1).) A party seeking to exclude a person from a dwelling under section 213.5 must demonstrate, among other things, "[f]acts sufficient for the court to ascertain that the party who will stay in the dwelling has a right under color of law to possession of the premises." (§ 213.5, subd. (e)(2)(A).)

13

Here, in granting the one-year restraining order protecting Father, Evelynn, Evan, Phillip Jr., and Ki.M., the court ordered Mother to move out of her home. Mother argues the court erred in doing so because Father failed to demonstrate his right to possession of the home. Mother also argues that, even if one of the children was listed on the lease, "a right to possession is not created for that child" because "[a] minor lacks the legal capacity to enter into a rental contract or to acquire an independent right to possess real property, so any right of the child to occupy the premises flows from the rights of the child's parent."

We " 'apply the substantial evidence standard to determine whether sufficient facts supported the factual findings in support of a [section 213.5] restraining order and the abuse of discretion standard to determine whether the court properly issued the order.' " (*In re S.G.* (2021) 71 Cal.App.5th 654, 670.) "When an appellant challenges 'the sufficiency of the evidence, . . . [i]f there is substantial evidence supporting the order, the court's issuance of the restraining order may not be disturbed.' " (*Id.* at pp. 670–671.)

### A. *The Children Have a Right to Possession*

In the proceedings below, Mother conceded the children had a right to possession of the home. We thus disregard her assertion on appeal that the children could not obtain such a right. (See, e.g., *In re T.G.* (2013) 215 Cal.App.4th 1, 14 ["In dependency litigation, '[a] party forfeits the right to claim error as grounds for reversal on appeal when he or she fails to raise the objection in the trial court' "].)

Father was required to demonstrate "[f]acts sufficient for the court to ascertain that the party who will stay in the dwelling has a right under color of law to possession of the premises."

14

(§ 213.5, subd. (e)(2)(A).)  The children, who were also protected by the restraining order and who had also joined in the request for a move-out order, were parties who would stay in the dwelling.  Thus, the court did not err in ordering Mother to move out.

## B.    *The Court Released the Children to Father*

The court released the children into Father's custody. Father had a legal duty to support and care for his children.  (See Fam. Code, § 3900.)  The court reinforced this duty when it ordered that Father care for the children at the home they had been living in.

Because the children had a possessory interest in the home, and Father was required to care for them, substantial evidence supports the court's conclusion that Father also sufficiently demonstrated a right to possession of the home under color of law while he was required to care for the children.

Citing *Nicole G. v. Braithwaite* (2020) 49 Cal.App.5th 990 (*Nicole G.*), Mother argues Father lacks a right to possession because "there is no evidence that Father regularly received mail at the home or paid any of the rent, utilities, or household expenses" for the home (fn. omitted), and that Father did not begin paying the bills until "after he was allowed to temporarily stay at the house."  *Nicole G.* is inapposite.[5]  There, the appellate court concluded the trial court properly ordered the defendant to

---

[5] *Nicole G.* analyzed Family Code section 6321, which also permits the issuance of a move-out order upon a showing that, among other things, "the party who will stay in the dwelling has a right under color of law to possess the property."  (*Nicole G., supra,* 49 Cal.App.5th at p. 999.)

15

move out of the home when the plaintiff was paying the mortgage and property taxes on the home. (*Id*. at p. 1001.) But nowhere did the court hold such payments were required for a move-out order.

Additionally, the record belies Mother's claim that there was no evidence Father received mail at the home or paid any expenses before temporarily moving in. DCFS received the referral on the night of December 28, 2024. Father presented evidence that: (1) he paid the Spectrum bill for the home on December 27, 2024; and (2) Spectrum sent him a letter at the home, dated December 28, 2024.

## DISPOSITION

The court's order is affirmed.

NOT TO BE PUBLISHED

M. KIM, J.

We concur:

ROTHSCHILD, P. J.

BENDIX, J.

16